[EDITORS' NOTE: TEXT NOT CERTIFIED FOR PUBLICATION APPEARS WITH GRAY BACKGROUND BELOW.]
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1390 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1391 
OPINION
Defendant Reynaldo Santos Dungo admitted choking his girlfriend Lucinda Correia Pina to death, but claimed he did so only after he was provoked to the point of losing control, and thus, was guilty of at most voluntary manslaughter. The jury disagreed and found defendant guilty of second degree murder, in part on the basis of the testimony of a pathologist (Dr. Robert Lawrence). (Pen. Code, § 187, subd. (a).)[1]
At issue is the defendant's Sixth Amendment right to cross-examine the pathologist (Dr. George Bolduc) who prepared the report on the cause of the victim's death. A critical fact in the trial was the duration of the choking, which bore on the defendant's culpability, whether he was guilty of murder or voluntary manslaughter. Dr. Lawrence was not present at the autopsy on the victim's body and was permitted to testify, over defendant's Sixth Amendment objection, as to the cause of death, including the amount of time the victim was choked before she died. In doing so, he relied on the facts adduced in an autopsy report prepared by Dr. Bolduc, Dr. Lawrence's employee.
The autopsy report itself was not admitted into evidence, though Dr. Lawrence disclosed portions of the report to the jury, and defendant was not able to cross-examine Dr. Bolduc either on the facts contained in the report or his competence to conduct an autopsy. Dr. Lawrence testified at a preliminary hearing[2] that he was aware that Dr. Bolduc had been fired from Kern County and had been allowed to resign "under a cloud" from Orange County and that both Stanislaus and San Joaquin Counties refused to use him *Page 1392 
to testify in homicide cases. He explained that if Dr. Bolduc testifies "it becomes too awkward [for the district attorney] to make them easily try their cases. And for that reason, they want to use me instead of him."
The trial court ruled that there was no Sixth Amendment issue "[s]ince the autopsy report is not actually being introduced, which would then cause an issue regarding trustworthiness and testimonial [evidence]
The Sixth Amendment issue is whether the autopsy report is "testimonial," and if so, whether allowing Dr. Lawrence, who was not present at the autopsy, to testify based on the facts in Dr. Bolduc's report violated defendant's right of confrontation under the Sixth Amendment. (See Crawford v.Washington (2004) 541 U.S. 36, 68 [158 L.Ed.2d 177, 203,124 S.Ct. 1354] (Crawford); Melendez-Diaz v.Massachusetts (2009) 557 U.S. ___ [174 L.Ed.2d 314,129 S.Ct. 2527] (Melendez-Diaz).)
We shall conclude that the autopsy report, which was prepared in the midst of a homicide investigation, is testimonial, and that Dr. Bolduc was a "witness" for purposes of theSixth Amendment. Because there was no showing that Dr. Bolduc was unavailable or that defendant had a prior opportunity to cross-examine him, defendant was entitled to "be confronted with" Dr. Bolduc at trial. Thus, the trial court erred in allowing Dr. Lawrence, a nonpercipient witness to the autopsy, to testify based on the contents of Dr. Bolduc's report.
Because the prosecution relied on Dr. Lawrence's testimony concerning the amount of time the victim was choked in arguing that defendant was guilty of murder and not voluntary manslaughter, we cannot conclude the error harmless beyond a reasonable doubt and shall reverse the judgment.[3]
 FACTUAL AND PROCEDURAL BACKGROUND I The Prosecution
Defendant and Pina began dating in December 2005. At the time, both were married but living apart from their spouses. *Page 1393 
In April 2006, Pina complained to her mother and friends that defendant was "smothering" her and told her mother that she wanted to end the relationship.
Around that same time, defendant intercepted a telephone call to Pina from Isaac Zuniga, Pina's former lover, and threatened to kill Zuniga if he did not stop calling.[4] Zuniga last spoke to Pina around noon on April 14, 2006. During that telephone call, Zuniga mentioned that he had attempted to telephone her a few weeks earlier, but a male answered and threatened to kill him if he did not stop calling. Pina sounded "pissed off," said she thought she knew who had answered the phone, and said she would talk to him about it.
On the night of April 14, 2006, defendant and Pina went to the home of Angelique and Felipe Torres to play dominos. During the visit, Pina asked Mrs. Torres whether she should confront defendant about answering her phone and telling Zuniga to stop calling. Pina and defendant left the Torres' home at approximately 1:00 a.m. the following morning and went to Pina's house.
Later that morning, defendant went next door to Pina's mother's home and asked her if she knew where Pina was. Defendant said that Zuniga had telephoned Pina sometime after 1:00 a.m. that morning, and that Pina had driven to Tracy "to take care of that situation." Pina's mother reported Pina missing later that day after she was unable to reach her on her cell phone.
On the morning of April 18, 2006, approximately three days after Pina went missing, police discovered her body inside her sports utility vehicle (SUV), which was parked in a residential area not far from her home. At that point, the investigation was turned over to the police department's robbery/homicide unit, and a detective from that unit was sent to investigate the crime scene. According to the detective, "the coroner had also been requested and was on scene." An autopsy was begun later that day and completed on April 19, 2006. The homicide detective that was sent to the scene to investigate was present during the autopsy.
Defendant was arrested on the morning of April 19, 2006. After waiving his Miranda[5] rights, he was interviewed by detectives Craig Takeda and *Page 1394 
Steven Capps. Defendant admitted "[c]hok[ing] [Pina] to death." After he and Pina returned from the Torres' home, they got into an argument that turned physical. Pina punched him in the chin and threw objects at him, and he grabbed her by the throat and choked her. He did so while straddling her as she was on her back on the floor. He stopped choking her once he saw that she had stopped breathing.
Defendant described Pina's death as an "accident" and said "[i]t was like I couldn't control my strength at the moment. . . . I didn't know what I was doing. I was a different person." He demonstrated how he strangled Pina on Takeda — placing four fingers from each of his hands on the sides of Takeda's neck and his thumbs over Takeda's Adam's apple.
After defendant realized Pina was dead, he immediately thought about how he was going to cover up what he had done. He carried Pina's body to her SUV, laid it on the floor, covered it with a blanket, and drove around for a while before parking the SUV where it was ultimately found.
Dr. Lawrence testified as to the cause of Pina's death. Dr. Lawrence owned Forensic Consultants and Medical Group, which contracted with San Joaquin and other counties to do "coroner's work." Dr. Bolduc, a pathologist employed by Dr. Lawrence, performed the autopsy on Pina's body and prepared the autopsy report. Dr. Lawrence was not present at the autopsy and relied exclusively on Dr. Bolduc's autopsy report and autopsy photos in forming his opinions concerning the cause of death.
Dr. Lawrence opined that Pina died as a result of "[a]sphyxia due to strangulation." He based his opinion on the presence of hemorrhages in the muscles on Pina's neck, pinpoint hemorrhages (called "petechiae") in her eyes, the purple color of her face, bite marks on her tongue, and the "absence of any natural disease that can cause death. . . ." He further opined that she was strangled for at least two minutes before she died. He based that opinion on the absence of a fractured voice box or hyoid bone, the presence of hemorrhages in the neck organs consistent with fingertips, and the lack of "extreme bruising."
 II The Defense
Defendant testified at trial. He admitted strangling Pina, but said he did so only after she physically and verbally provoked him to the point where he *Page 1395 
lost control. He and Pina had been arguing in the weeks prior to her death, mostly about Zuniga's calls. He believed Pina was romantically involved with Zuniga, although she denied it. After they returned from the Torres' home on the morning of April 15, 2006, they began to get intimate, but Pina apparently suspected something was wrong and asked defendant what was bothering him. He told her that he was still bothered by Zuniga's telephone calls. Pina denied talking to Zuniga and told defendant he was "full of shit." Thereafter, she repeatedly walked away from him as he followed her from room to room. At one point, he grabbed her arm, and she lightly punched him on the chin. She then placed some of his clothes and other belongings in a box and told him to "get the fuck out of here." She also told him, "I will see whoever I want. No man will control me. I will do whatever I want. . . . I'll fuck whoever I want. . . . If I want to fuck you, if I want to fuck [Zuniga], if I want to fuck [my husband], I will do whatever the hell I want." When she again began to walk away, defendant grabbed her arm. She hit him and told him that he probably did not have his daughter because "[Y]ou're not even a good father. You're a lousy fucking father." Defendant "lost it." He grabbed Pina by the neck and said, "Fuck you Lucinda. I'm a good dad. I'm a good dad. I'm not a bad father. Fuck you."
Defendant did not know what he was doing when he was strangling her and did not intend to kill her. He did not know how long he choked her, but said "[i]t didn't seem long."
 DISCUSSION
Relying on Crawford, supra, 541 U.S. 36
[158 L.Ed.2d 177], defendant contends that his "Sixth Amendment right to confrontation was violated by Dr. Lawrence's testimony relaying the contents of Dr. Bolduc's autopsy report." We agree.
 I Background
Prior to trial, the prosecution notified defendant that it intended to call Dr. Lawrence as an expert to testify regarding the cause of death and autopsy related issues. Noting that Dr. Bolduc, and not Dr. Lawrence, performed the autopsy on Pina's body, defendant moved in limine to preclude Dr. Lawrence from testifying at trial. He argued that allowing Dr. Lawrence to testify "would violate [his] constitutional right to confront his accusers under" the *Page 1396 Sixth and Fourteenth Amendments to the United States Constitution. Defendant also raised issues regarding Dr. Bolduc's competence and credibility, asserting that Dr. Bolduc had made mistakes in prior cases, had been fired from Kern County and allowed to resign from Orange County, and that other counties, including San Joaquin, refused to use him to testify in homicide cases. In response to the court's observation that Dr. Lawrence would give his own opinions, not Dr. Bolduc's, defendant explained that "[Dr. Lawrence's] opinions are based upon the work done by Dr. Bolduc . . ., and the reason [the district attorney's office is] not using him is because Dr. Bolduc does work that isn't necessarily good work. It's bad work that misses things. So Dr. Lawrence is basing his opinion on that which he doesn't have any knowledge, other than the report, and . . . this opinion and information is not trustworthy." Defendant asserted that he had the right to confront the person who performed the autopsy to assess the accuracy of his observations.
The trial court ruled that allowing Dr. Lawrence to testify instead of Dr. Bolduc did not present a confrontation clause problem because "experts can rely on hearsay to help form their opinions and it doesn't call into effect the Crawford
issue because that's not being used for the truth of the matter, that's just what he based his opinion on. Since the autopsy report is not actually being introduced, which would then cause an issue regarding trust-worthiness and testimonial, we're not getting to" the Crawford issue. The court also ruled that defendant would be permitted to cross-examine Dr. Lawrence on "what his opinions [are] based on, what information he relied on and where he got that information" and set an Evidence Code section 402 hearing to determine the scope of that cross-examination.
At the Evidence Code section 402 evidentiary hearing, Dr. Lawrence testified that he was aware of "baggage associated with [Dr. Bolduc's] career," which he characterized as "95 percent fluff." He confirmed that Dr. Bolduc had been fired from Kern County and had been allowed to resign "under a cloud" from Orange County; both Stanislaus and San Joaquin Counties refused to use Dr. Bolduc to testify in homicide cases; and Sonoma County was reluctant to use him. He explained that "[t]he only reason they won't use him is because the law requires the [district [a]ttorney provide this background information to each defense attorney for each case, and they feel it becomes too awkward to make them easily try their cases. And for that reason, they want to use me instead of him."
According to Dr. Lawrence, Dr. Bolduc was as qualified as anyone, including himself, to perform the duties of a forensic pathologist. To his *Page 1397 
knowledge, the only thing Dr. Bolduc had ever done wrong was falsifying his resume by failing to mention he had worked for Kern County and instead indicating he had been an "independent consultant." When asked about specific allegations concerning Dr. Bolduc's handling of prior cases, Dr. Lawrence explained that "th[ose] situations are something that is difficult for me to address because I don't have the detail and none of them make sense to me." For example, when asked about a death penalty case from the late 1980's or 1990's in which Dr. Bolduc testified that the cause of death was strangulation and it was later found that the victim died from complications due to asthma, Dr. Lawrence responded that he was not familiar with the details of that case.
The trial court ruled that it would "allow all the cross-examination on Dr. Lawrence regarding Dr. Bolduc."
As detailed above, at trial, Dr. Lawrence confirmed that he was not present during the autopsy and that he relied exclusively on Dr. Bolduc's autopsy report and autopsy photos in forming his opinions concerning the cause of death. In explaining the basis for his opinions, he disclosed portions of the autopsy report to the jury. The autopsy report itself was not admitted.
During her closing argument, the prosecutor relied on Dr. Lawrence's testimony that Pina was strangled for at least two minutes in arguing that Pina's death was murder and not "a heat of passion killing." She reminded the jury of a demonstration she had done where she just sat there for two minutes, and asked, "Remember how long that seemed? That's a long time to have your hands around someone's neck while they're struggling. He had to hold onto her, and not just for two minutes, it could have been longer, that's the minimum for an average person. Remember, Dr. Lawrence said three minutes given these injuries. . . . [¶] So the two minute, three-minute minimum that Dr. Lawrence gave us should be considered. . . . [¶] . . . [¶] The defendant had to make the conscious decision to hold onto her neck, to keep his grip while she's struggling and to overcome her resistance. He had time to reflect and to let go. . . ."
 II Analysis
The Sixth Amendment to the United States Constitution, made applicable to the states via the Fourteenth Amendment (Pointer v. Texas (1965) *Page 1398 380 U.S. 400, 401 [13 L.Ed.2d 923, 924, 85 S.Ct. 1065]), provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him. . . ." In Crawford, the United States Supreme Court held that a defendant's Sixth Amendment right of confrontation is violated by the admission of testimonial statements of a witness who was not subject to cross-examination at trial, unless the witness was unavailable to testify and the defendant had a prior opportunity for cross-examination. (Crawford, supra, 541 U.S. at p. 68
[158 L.Ed.2d at p. 203].) The court cited a dictionary finition of "testimony" as "`[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact,'" and confirmed that the "core class" of testimonial statements includes affidavits, custodial examinations, prior testimony not subject to cross-examination, and "`statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.'" (Id. at pp. 51-52 [158 L.Ed.2d at pp. 192-193].)
The United States Supreme Court recently revisited the issue of what constitutes a "testimonial" statement inMelendez-Diaz, supra, 557 U.S. ___ [174 L.Ed.2d 314].[6] In that case, the defendant objected to the admission of three "certificates of analysis" that showed the seized substances contained cocaine. (Id. at pp. ___ — ___ [174 L.Ed.2d at pp. 319-320].) In Massachusetts, state law required a forensic analyst, at the request of the police, to test seized evidence for the presence of illegal drugs and required the analyst to provide the police with his or her findings on a "signed certificate, on oath. . . ." (Mass. Gen. Laws Ann. ch. Ill, § 13 (2009).) The certificate could then be admitted in court as prima facie evidence of the composition, quality, and net weight of the substance at issue in the prosecution. (Mass. Gen. Laws Ann. ch. 22C, § 39
(2009).) The court held that these certificates, which it described as "quite plainly affidavits," were testimonial statements because they were made under oath and under circumstances which would lead an objective witness to believe that the statement would be available for use at a later trial; indeed, the court noted that the sole purpose of the certificates was to provide prima facie evidence at trial. (Melendez-Diaz, at p. ___ [174 L.Ed.2d at p. 321].) The court further observed that the certificates "are incontrovertibly a `"solemn declaration or affirmation made for the purpose of establishing or proving some fact,"`" namely that the substance found in defendant and his codefendants' possession was cocaine. (Ibid., quoting Crawford,supra, 541 U.S. at p. 51 [158 L.Ed.2d at p. 192].) *Page 1399 
The court rejected the argument that a lab analyst's report is not testimonial because it contains "near-contemporaneous" observations of a scientific test, rather than statements by lay witnesses of events observed in the past. (Melendez-Diaz, supra, 557 U.S. at pp. ___ — ___ [174 L.Ed.2d at pp. 324-325].) It also rejected a related argument that there is a difference between testimony recounting past events, "which is `prone to distortion or manipulation,'" and testimony that is the result of "`neutral, scientific testing.'" (Id. at pp. ___ — ___ [174 L.Ed.2d at pp. 325-326].) The court explained that "[f]orensic evidence is not uniquely immune from the risk of manipulation. . . . A forensic analyst responding to a request from a law enforcement official may feel pressure — or have an incentive — to alter the evidence in a manner favorable to the prosecution." (Id. at p. ___ [174 L.Ed.2d at p. 326].) The court added, "Confrontation is designed to weed out not only the fraudulent analyst, but the incompetent one as well." (Ibid.)
A. Dr. Bolduc's Autopsy Report Is Testimonial
Given the court's holding in Melendez-Diaz, there can be little doubt that Dr. Bolduc's autopsy report is testimonial. The purpose of an autopsy is to determine the circumstances, manner, and cause of death. (Gov. Code, § 27491; Dixon v. Superior Court (2009)170 Cal.App.4th 1271, 1277 [88 Cal.Rptr.3d 847] (Dixon) ["It is through the coroner and autopsy investigatory reports that the coroner `inquire[s] into and determine[s] the circumstances, manner, and cause' of criminally related deaths."].)[7] The findings resulting from the autopsy must be "reduced to writing" or otherwise permanently preserved. (Gov. Code, § 27491.4.) Upon determining that there are reasonable grounds to suspect that a death "has been occasioned by the act of another by criminal means," the coroner must "immediately notify the law enforcement agency having jurisdiction over the criminal investigation." (Gov. Code, § 27491.1)[8] Moreover, this court recently concluded that "officially inquiring into and determining the circumstances, manner and cause of a criminally related death is certainly part of a law enforcement investigation." (Dixon, supra, 170 Cal.App.4th at p. 1277.)[9] *Page 1400 
These circumstances, coupled with the fact that Dr. Bolduc's report was prepared in the midst of a homicide investigation, a circumstance of which he was no doubt aware given that a homicide detective who was investigating Pina's death was present at the autopsy (Gov. Code, § 27491.4), [10]
establish that Dr. Bolduc's autopsy report was testimonial. As with the certificates at issue in Melendez-Diaz, the autopsy report constitutes a "`"solemn declaration or affirmation made for the purpose of establishing or proving some fact"`" (Melendez-Diaz, supra, 557 U.S. at p. ___ [178 L.Ed.2d at p. 321]), namely the "circumstances, manner and cause" of Pina's death. Moreover, it plainly was "`made under circumstances which would lead an objective witness reasonably to believe that [it] would be available for use at a later trial.'" (Melendez-Diaz, supra, 557 U.S. at p. ___ [178 L.Ed.2d at pp. 321-322].)
The People argue that "[a]lthough a medical examiner may reasonably expect that an autopsy report will be used in a criminal prosecution when the deceased appears to be the victim of foul play, that circumstance alone does not make the report testimonial." Relying on People v. Cage (2007)40 Cal.4th 965 [56 Cal.Rptr.3d 789, 155 P.3d 205], the People assert that Dr. Bolduc's autopsy report is not testimonial because it "was not generated for the primary purpose of helping the prosecution establish criminal liability."
In Cage, the court considered whether an assault victim's statement to a treating physician at the hospital was testimonial. (People v Cage, supra,40 Cal.4th at p. 970.) To help diagnose the nature of the victim's injury (a slash wound) and determine the appropriate treatment, the physician asked the victim, "`What happened?'" (Ibid.) The court concluded that the victim's statement to his physician was not testimonial because "[objectively viewed, the primary purpose of the question, and the answer, was not to establish or prove past facts for possible criminal use, but to help [the physician] deal *Page 1401 
with the immediate medical situation he faced." (Id. at p. 986.) To be testimonial, a "statement must have been given and taken primarily for thepurpose ascribed to testimony — to establish or prove some past fact for possible use in a criminal trial." (Id. at p. 984.)
Even assuming the standard set forth in Cage remains good law after Melendez-Diaz and applies to cases not involving emergency situations, Dr. Bolduc's autopsy report satisfies that standard.
The circumstances set forth above leave no doubt that the primary purpose of Dr. Bolduc's autopsy report was to establish or prove some past fact, i.e., the circumstances, manner, and cause of Pina's death, for possible use in a criminal trial. Most notably, the report was prepared during the midst of a homicide investigation as Dr. Bolduc was no doubt aware since a homicide detective was present during the autopsy.[11]
 B. The Trial Court Erred in Admitting Dr. Lawrence's Testimony Based on the Contents of Dr. Bolduc's Report
Unlike the certificates at issue in Melendez-Diaz, Dr. Bolduc's autopsy report was not admitted into evidence. Instead, Dr. Lawrence relied on Dr. Bolduc's report in forming his opinions concerning the cause of death and disclosed the contents of the report while testifying as to the basis for his opinions.[12] The People assert that allowing Dr. Lawrence to testify concerning the contents of Dr. Bolduc's autopsy report did not run afoul of the confrontation clause because the information in Dr. Bolduc's report was not offered for its truth, but only as a basis for Dr. Lawrence's opinion, and *Page 1402 
defendant had an opportunity to cross-examine Dr. Lawrence concerning the contents of Dr. Bolduc's report and Dr. Bolduc himself. The People rely on People v. Thomas (2005)130 Cal.App.4th 1202 [30 Cal.Rptr.3d 582] (Thomas) in support of their assertion.
In Thomas, the defendant was charged with, among other things, active participation in a criminal street gang in connection with the theft of a truck. (Thomas, supra,130 Cal.App.4th at p. 1207.) At trial, a police officer testified as a "gang expert" and opined that the defendant was a member of the Elsinor Young Classics (E.Y.C.) gang and that the crime was committed for the benefit of the E.Y.C. (Id. at pp. 1205-1206.) The officer based his opinion that the defendant was a gang member on, among other things, "casual, undocumented conversations" with other gang members who told him that the defendant was a member of E.Y.C. and that his moniker was "Little Casper" or "Villain." (Id. at pp. 1206, 1208.)
The defendant argued that the statements of gang members upon which the police officer relied in forming his opinion were testimonial, and thus, inadmissible under Crawford.
In affirming the conviction, the Thomas court accepted the defendant's characterization of the testifying police officer's "casual, undocumented conversations" as testimonial. (Thomas, supra, 130 Cal.App.4th at pp. 1208-1209.) Thus, Thomas did not actually decide whether the gang members' statements were "`made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.'" (Crawford, supra, 541 U.S. at p. 52
[158 L.Ed.2d at p. 193].) Under Crawford, the gang members' casual conversations with the officer do not appear to be testimonial in the same way as "prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and . . . police interrogations" that are "`made for the purpose of establishing or proving some fact.'" (Id. at pp. 51, 68 [158 L.Ed.2d at pp. 192, 203.)
In contrast to the casual nature of the conversations recounted in Thomas, the autopsy report in this case was formally prepared in anticipation of a prosecution. This is the sort of evidence — cloaked in the authority of a medical examiner and inherently designed to aid criminal prosecution — that the United States Supreme Court has warned against exempting from Sixth Amendment protections. (SeeMelendez-Diaz, supra, 557 U.S. at p. ___ [174 L.Ed.2d at p. 321], quoting White v. Illinois (1992)502 U.S. 346, 365 [116 L.Ed.2d 848, 865, 112 S.Ct. 736] (cone. opn. of Thomas, J.) ["`[T]he Confrontation Clause is implicated by extrajudicial statements only insofar as they are contained informalized testimonial materials, such as affidavits, *Page 1403 
depositions, prior testimony, or confessions.'" (italics added)].) Casual street-corner conversations with gang members are a far cry from the formal autopsy report at issue in this case.
Here, we conclude that Dr. Lawrence's reliance on Dr. Bolduc's report violated defendant's right of confrontation.[13] The jury in this case was instructed that "[t]he meaning and importance of any [expert] opinion are for you to decide. In evaluating the believability of an expert witness . . . [¶] . . . consider . . . the reasons the expert gave for any opinion and the facts or information on which the expert relied in reaching that opinion. You must decide whetherinformation on which the expert relied was true andaccurate." (Italics added.) Thus, in evaluating Dr. Lawrence's opinions concerning the cause of Pina's death, the jury was required to evaluate the truth and accuracy of Dr. Bolduc's autopsy report. In other words, the weight of Dr. Lawrence's opinions was entirely dependent upon the accuracy and substantive content of Dr. Bolduc's report. (See Mnookin,Expert Evidence and the Confrontation Clause after
Crawford v. Washington (2007) 15 J.L. Pol'y 791, 822-823 (Mnookin) ["[T]o pretend that expert basis statements are introduced for a purpose other than the truth of their contents is not simply splitting hairs too finely or engaging in an extreme form of formalism. It is, rather, an effort to make an end run around a constitutional prohibition by sleight of hand."].)[14]
Moreover, the fact that Dr. Lawrence was available for cross-examination did not satisfy defendant's right of confrontation. Where, as here, an expert bases his opinion on testimonial statements and discloses those statements to the jury, Crawford requires that the defendant have the *Page 1404 
opportunity to confront the individual who issued them. Substituted cross-examination is not constitutionally adequate. (See Mnookin, supra, 15 J.L. Pol'y at p. 834["Crawford's language simply does not permit cross-examination of a surrogate when the evidence in question is testimonial."]; Seaman, Triangulating TestimonialHearsay: The Constitutional Boundaries of Expert OpinionTestimony (2008) 96 Geo. L.J. 827, 847-848 ["[I]f the [expert's] opinion is only as good as the facts on which it is based, and if those facts consist of testimonial hearsay statements that were not subject to cross-examination, then it is difficult to imagine how the defendant is expected to `demonstrate the underlying information [is] incorrect or unreliable.'"].) As the court observed inMelendez-Diaz, the prosecution's failure to call the lab analysts as witnesses prevented the defense from exploring the possibility that the analysts lacked proper training or had poor judgment or from testing their "honesty, proficiency, and methodology." (Melendez-Diaz, supra, 557 U.S. at p. __ [174 L.Ed.2d at p. 328].) The same is true here. The prosecution's failure to call Dr. Bolduc as a witness prevented the defense from exploring the possibility that he lacked proper training or had poor judgment or from testing his honesty, proficiency, and methodology. Notably, that was the prosecution's intent.
As Dr. Lawrence explained at the evidentiary hearing, San Joaquin County refused to call Dr. Bolduc as a witness in homicide cases because his background made it "awkward [for] them [to] easily try their cases"; thus, they used Dr. Lawrence instead. The reason is plain — Dr. Bolduc had "baggage." He had been fired from Kern County and allowed to resign "under a cloud" from Orange County, Stanislaus and San Joaquin Counties refused to use him to testify in homicide trials, and Sonoma was reluctant to use him. He falsified his resume. His competence had been questioned in prior cases. Moreover, this case illustrates the inadequacies of substitute cross-examination. While Dr. Lawrence generally was aware of Dr. Bolduc's work history, Dr. Lawrence was unable to respond to specific questions concerning Dr. Bolduc's alleged incompetence in prior cases.
Because Dr. Bolduc's report was testimonial, and there was no showing that he was unavailable to testify at trial or that defendant had a prior opportunity to cross-examine him, defendant was entitled to "`be con-fronted with'" him at trial. (Melendez-Diaz, supra, 557 U.S. at p. ___ [174 L.Ed.2d at p. 322].) Thus, Dr. Lawrence's testimony relaying the contents of Dr. Bolduc's autopsy report violated defendant's right of confrontation.
 C. The Admission of Dr. Lawrence's Testimony Based on Dr. Bolduc's Report Was Not Harmless
Confrontation clause violations are subject to federal harmless error analysis under Chapman v. California (1967)386 U.S. 18, 24 [17 L.Ed.2d 705, 711, *Page 1405 87 S.Ct. 824]. (Delaware v. Van Arsdall (1986)475 U.S. 673, 681 [106 S.Ct. 1431, 89 L.Ed.2d 674, 684-685];People v. Cage, supra, 40 Cal.4th at pp. 991-992.) The harmless error inquiry asks: "Is it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error?" (Neder v. United States
(1999) 527 U.S. 1, 18 [144 L.Ed.2d 35, 54, 119 S.Ct. 1827].) Here the answer is no.
Defendant was convicted of second degree murder. "`"Murder is the unlawful killing of a human being with malice aforethought. ([Pen. Code,] § 187, subd. (a).) A defendant who commits an intentional and unlawful killing but who lacks malice is guilty of . . . voluntary manslaughter. ([Pen. Code,] § 192.)" [Citation.] Generally, the intent to unlawfully kill constitutes malice. [Citations.] "But a defendant who intentionally and unlawfully kills [nonetheless] lacks malice . . . when [he] acts in a `sudden quarrel or heat of passion' ([Pen. Code,] § 192, subd. (a)). . . ." . . .' [¶] Th[at] mitigating circumstances reduce an intentional, unlawful killing from murder to voluntary manslaughter `by negatingthe element of malice that otherwise inheres in such a homicide [citation].' [Citation.]" (People v. Rios
(2000) 23 Cal.4th 450, 460-461 [97 Cal.Rptr.2d 512,2 P.3d 1066].) "`Heat of passion arises when "at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment."`" (People v. Lee (1999)20 Cal.4th 47, 59 [82 Cal.Rptr.2d 625, 971 P.2d 1001].)
While defendant admitted strangling Pina to death, he said he did so only after he was provoked to the point of losing control and argued he was guilty of at most voluntary manslaughter. The prosecution's argument that defendant was guilty of intentional murder, and not voluntary manslaughter, was based in large part on the theory that during the time it took for defendant to strangle Pina, what may have begun as passion shaded into intent. The only evidence offered by the prosecution in support of this theory was Dr. Lawrence's testimony that Pina was strangled for at least two minutes before she died, which he based on Dr. Bolduc's report.[15] The prosecutor relied on that testimony during her closing argument in arguing defendant was guilty of murder and not voluntary manslaughter. On this record, we cannot say that allowing Dr. Lawrence to testify as to the contents of Dr. Bolduc's report was harmless beyond a reasonable doubt. *Page 1406 
 DISPOSITION
The judgment is reversed and the matter is remanded for retrial.[16]
Sims, J., and Nicholson, J., concurred.
[1] He was sentenced to 15 years to life in state prison.
[2] Evidence Code section 402.
[3] Because we shall reverse the judgment on this ground, we need not consider defendant's additional contentions.
[4] Zuniga was certain defendant used the word "kill," however, the officer who interviewed Zuniga indicated in his report that defendant threatened to "call" him. The officer said he would have written "kill" if Zuniga had told him defendant had threatened to kill him.
[5] Miranda v. Arizona (1966) 384 U.S. 436
[16 L.Ed.2d 694, 86 S.Ct. 1602].
[6] Melendez-Diaz was decided while the instant matter was pending here on review. The parties had already submitted their briefs on the merits. We therefore solicited, and received, supplemental letter briefs addressing the significance of Melendez-Diaz on defendant's confrontation clause claim.
[7] Government Code section 27491 provides, in pertinent part: "It shall be the duty of the coroner to inquire into and determine the circumstances, manner, and cause of all violent, sudden, or unusual deaths; . . . known or suspected homicide . . . ; . . . deaths due to . . . strangulation . . .; death in whole or in part occasioned by criminal means; . . . deaths under such circumstances as to afford a reasonable ground to suspect that the death was caused by the criminal act of another. . . . Inquiry pursuant to this section does not include those investigatory functions usually performed by other law enforcement agencies."
[8] In San Joaquin County, the sheriff also serves as the coroner. The county, however, contracts out for coroner services.
[9] As the People correctly note, Dixon did not involve a confrontation clause challenge. The issue there was whether coroner and autopsy reports are exempt from disclosure under the Public Records Act (Gov. Code, § 6250 et seq.) as "`investigatory . . . files compiled by any other . . . local agency for . . . law enforcement . . . purposes.'" (Dixon,supra, 170 Cal.App.4th at p. 1276, fn. omitted.) Noting that "[n]o one can dispute that the office of the coroner, at a minimum, is a local agency," the court indicated that "[t]he issue is whether the coroner, as part of his local agency duties, compiles investigatory files for law enforcement purposes." (Ibid.) In answering the question in the affirmative, the court analyzed Government Code section 27491, reasoning that "the sentence in [Government Code] section 27491 that states, `Inquiry pursuant to this section does not includethose investigatory functions usually performed byother law enforcement agencies' . . ., implicitly recognizes that a coroner's inquiry encompasses an investigative function performed by the coroner as a law enforcement agency." (170 Cal.App.4th at p. 1277.) We find the court's interpretation of Government Code section 27491 and its reasoning applies with equal force here.
[10] Government Code section 27491.4, subdivision (a), provides in pertinent part that: "No person may be present during the performance of a coroner's autopsy without the express consent of the coroner."
[11] In their opening brief, the People relied on Peoplev. Geier (2007) 41 Cal.4th 555, 605 [61 Cal.Rptr.3d 580,161 P.3d 104], for the proposition that the autopsy report is not testimonial because it constitutes a "contemporaneous recordation of observable events." In their supple-mental letter brief, the People correctly acknowledge that "the reasoning in Melendez-Diaz undermines some of the rationale of People v. Geier," and withdraw their argument that the autopsy report is not testimonial because it constitutes a "contemporaneous recordation of observable events."
[12] While Dr. Lawrence did not specify whether he was referring to Dr. Bolduc's findings or the photographs in setting forth the basis for his opinions, it is clear elsewhere in the record that he was in fact referring to Dr. Bolduc's findings. At the evidentiary hearing, Dr. Lawrence stated that Dr. Bolduc's report was "complete, excellent, and allowed me to arrive at my own conclusion" and "indicates all the things that are normally put in a report of this type to allow somebody like me, independently, to make a conclusion as to the cause and circumstance of death." Moreover, one of the three factors Dr. Lawrence cited as a basis for his opinion that Pina was strangled for at least two minutes was the presence of hemorrhages in the neck organs. When asked whether hemorrhages were present in all layers of the neck muscles, he responded that "[Dr. Bolduc] described that. I couldn't be sure in the photographs exactly how many layers were involved, but there were definite hemorrhages, and so I would have to rely on [Dr. Bolduc's] description."
[13] A new rule announced by the United States Supreme Court applies to all criminal cases still pending on appeal. (Schriro v. Summerlin (2004) 542 U.S. 348, 351
[124 S.Ct. 2519, 159 L.Ed.2d 442, 448].) The Supreme Court has held that Crawford is not a "watershed" rule retroactive to cases already final on appeal. (Whorton v. Bockting
(2007) 549 U.S. 406, 409, 421 [167 L.Ed.2d 1, 6, 14,127 S.Ct. 1173].) However, we express no opinion on the retroactivity ofMelendez-Diaz, an issue which is not properly before us.
[14] The People's reliance on Evidence Code section 801, subdivision (b), which allows an expert witness to offer opinions based on matters made known to him, whether or not admissible, if such material is reasonably relied upon by experts in the field, is misplaced. Where testimonial hearsay is involved, the confrontation clause trumps the rules of evidence. (Crawford, supra, 541 U.S. at p. 51
[158 L.Ed, at p. 192 ["Leaving the regulation of out-of-court statements to the law of evidence would render theconfrontation clause powerless to prevent even the most flagrant inquisitorial practices." (italics added)].)Nelson v. County of Los Angeles (2003)113 Cal.App.4th 783, 792 [6 Cal.Rptr.3d 650], also cited by the People, is a civil case, and thus, is of no assistance here. Finally,Manocchio v. Moran (1st Cir. 1990) 919 F.2d 770, 780, also cited by the People, predates Crawford and applies the "reliability" test set forth in Ohio v.Roberts (1980) 448 U.S. 56 [65 L.Ed.2d 597,100 S.Ct. 2531], which was expressly overruled in Crawford,supra, 541 U.S. at pages 61-64
[158 L.Ed.2d at pp. 199-200]. Thus, that case does not aid us in our decision here.
[15] Defendant testified that he did not know how long he choked Pina, but said "[i]t didn't seem long."
[16] The People may retry defendant because the evidence, including that which was erroneously admitted, was sufficient to support defendant's conviction. (Lockhart v.Nelson (1988) 488 U.S. 33, 40 [102 L.Ed.2d 265, 273,109 S.Ct. 285]; see also People v. Venegas (1998)18 Cal.4th 47, 95 [74 Cal.Rptr.2d 262, 954 P.2d 525].) *Page 1407