185 Cal.App.4th 238 (2010)
THE PEOPLE, Plaintiff and Respondent,
v.
MARSHALL FRANK CHIKOSI, Defendant and Appellant.
No. G041014.
Court of Appeals of California, Fourth District, Division Three.
May 6, 2010.
*240 Heather R. Rogers and Beatrice Tillman, under appointments by the Court of Appeal, for Defendant and Appellant.
Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Rhonda Cartwright-Ladendorf and Stacy Tyler, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION
BEDSWORTH, J. 
Appellant was convicted of driving under the influence of alcohol, driving with a blood-alcohol level of 0.08 percent or more, and evading the police. He contends the trial court erred in admitting his Breathalyzer test results, because the prosecution's witnesses relied on hearsay in forming their opinions about the accuracy of those results. We find no error in this regard. Although we modify the judgment to correct an undisputed sentencing error and properly reflect the court's sentencing decision, we affirm the judgment in all other respects.

FACTS
Around midnight, Tustin Police Officer Matthew Nunley noticed appellant driving through a parking lot at a high rate of speed. He shined his spotlight on appellant's car, hoping that would slow him down, but appellant sped up and made his way onto the roadway. Nunley followed, and upon seeing appellant run a red light, he activated his overhead lights and siren. In the mile-long pursuit that followed, appellant ran another red light and reached speeds of 60 to 70 mph before eventually pulling over.
*241 When he did, Nunley stopped behind him and ordered him out of his car. Appellant was slow to comply and unsteady on his feet. He also muttered something about having "already poured the drink." Nunley handcuffed him and placed him in the back of his police car, at which point appellant admitted he had "too much" to drink that night. Consistent with this admission, his breath smelled of booze, his speech was slurred, and his eyes were watery and bloodshot. After finding a half-empty bottle of vodka in appellant's car, Nunley arrested him and took him to the police station.
There, he gave appellant a series of sobriety tests to determine the extent of his impairment. After appellant performed poorly on the tests, Nunley gave him a Breathalyzer test using a machine called the Alco-Sensor IV-XL (Alco-Sensor). Appellant provided two breath samples for the test, and they both yielded a blood-alcohol level of 0.18 percent.
At trial, appellant challenged the accuracy of those readings. More particularly, he challenged the accuracy of the Alco-Sensor machine that Nunley used to test his blood-alcohol level. Nunley testified he is certified to use the Alco-Sensor in the field and also qualified to conduct accuracy tests on the machine. However, he was not involved in testing the accuracy of the particular machine he used in appellant's case. Rather, that machine was tested by Tustin Police Officer Bernie Rowe. Although Rowe did not testify at trial, the court allowed Nunley to rely on the accuracy records that Rowe produced. Based on his review of those records, Nunley opined the machine was working accurately at the time he used it on appellant.
Kari Sterling also testified to the accuracy of the machine. A forensic alcohol analyst at the county's crime lab, she explained the Alco-Sensor operates using fuel cell technology. When alcohol is introduced into the cell, a chemical reaction occurs. That reaction releases electricity, which is converted by the instrument into a blood-alcohol reading.
Sterling said that, by law, the Alco-Sensor machines must be tested for accuracy at least once every 10 days. This is done by placing an air sample with a known alcohol value in the machine. If the machine reads the sample within 0.01 percent of that value, the machine is deemed to be accurate. If it does not read the sample within that range, the machine will automatically "lock out" and become inoperable. When that occurs, the machine is taken out of service and has to be recalibrated before it can be used again.
Sterling said accuracy records are kept for each machine and are made at or near the time the machines are tested. The accuracy records are kept in a database at the crime lab, and there are also handwritten maintenance logs that correspond to the electronic files. To generate an accuracy record, all the *242 tester has to do is enter his name and the value of the alcohol sample into the machine, and the machine will automatically conduct the test and produce a result; no human analysis is involved in the process.
Like Nunley, Sterling reviewed the records of the testing that Rowe conducted on the machine in question. She said those records show the machine was tested one day before, and five days after, appellant's arrest, and on both occasions, the machine tested within the acceptable margin of error of 0.01 percent. She therefore believed the machine was working accurately when Nunley used it on appellant.

I
Because Rowe did not testify, appellant contends the court erred in allowing Nunley and Sterling to rely on his records to establish the reliability of the subject machine. He contends this procedure violated his Sixth Amendment right of confrontation, and therefore the results of his breath test should not have been admitted into evidence. We disagree.
(1) Under the Sixth Amendment, the defendant in a criminal case has the right "to be confronted with the witnesses against him." (U.S. Const., 6th Amend.) That right protects the defendant against the admission of "testimonial" hearsay unless the declarant is unavailable at trial and the defendant has had a prior opportunity to cross-examine him. (Crawford v. Washington (2004) 541 U.S. 36, 53-54 [158 L.Ed.2d 177, 124 S.Ct. 1354].)
Speaking to the issue of when police statements are testimonial for purposes of the Sixth Amendment, the United States Supreme Court in Davis v. Washington (2006) 547 U.S. 813 [165 L.Ed.2d 224, 126 S.Ct. 2266] ruled, "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." (Id. at p. 822, fn. omitted.)
Just last year, in Melendez-Diaz v. Massachusetts (2009) 557 U.S. ___ [174 L.Ed.2d 314, 129 S.Ct. 2527] (Melendez-Diaz), the United States Supreme Court determined information contained in lab reports can constitute testimonial hearsay in some circumstances. The reports at issue there were actually "certificates of analysis" showing that a substance found in the defendant's possession had tested positive for cocaine. (Id. at p. ___ [129 S.Ct. at p. 2531].) Because the certificates constituted sworn affidavits and were *243 prepared for the sole purpose of proving the defendant's guilt at trial, the court determined the defendant had the right to confront the analysts who prepared them. (Id. at pp. ___ - ___ [129 S.Ct. at pp. 2532-2533].)
Our case is different from Melendez-Diaz in that appellant was allowed to confront and cross-examine the person who obtained the test results that incriminated him, i.e., Officer Nunley. The question we must decide is whether appellant had the right to confront the person who tested the accuracy of the machine Nunley used, i.e., Officer Rowe. As to that issue, the Supreme Court's decision in Melendez-Diaz is informative.
(2) Responding to the fears that requiring live testimony from everyone involved in the testing process would overburden the states, the majority in Melendez-Diaz made clear that not everyone "whose testimony may be relevant in establishing the chain of custody, authenticity of the sample, or accuracy of the testing device, must appear in person as part of the prosecution's case." (Melendez-Diaz, supra, 557 U.S. at p. ___, fn. 1 [129 S.Ct. at p. 2532, fn. 1].) As particularly relevant here, the majority noted "documents prepared in the regular course of equipment maintenance may well qualify as nontestimonial records. [Citation.]" (Ibid.)
That makes good sense because while cross-examination of those who conduct substantive analysis of key evidence, like the drug analysts in Melendez-Diaz, may be useful in terms of testing their "honesty, proficiency, and methodology" (Melendez-Diaz, supra, 557 U.S. at p. ___ [129 S.Ct. at p. 2538]), testimony from technicians who merely test the accuracy of machines or other equipment is not as likely to produce fruitful evidence for the defense. Take Rowe, for example. His job in testing the accuracy of an Alco-Sensor is simply to enter his name and the value of the subject alcohol sample into the machine. After that, the machine, not Rowe, analyzes the sample and produces a reading. If the reading is not within the acceptable margin of error, the machine automatically becomes inoperable and will be taken out of service. This not only helps ensure the accuracy of the machines, it largely removes the human element from the testing process, thereby lessening the value of cross-examination.
(3) In the wake of Melendez-Diaz, courts have recognized testing technicians such as Rowe generally do not play such an important role in the adversarial process so as to mandate their appearance at trial. For instance, in U.S. v. Bacas (E.D.Va. 2009) 662 F.Supp.2d 481, the defendant challenged his conviction for speeding on the grounds the prosecution failed to produce the technician who tested the accuracy of certain tuning forks. He argued the technician's presence at trial was required under the Sixth Amendment because the tuning forks were used by the arresting officer to calibrate the *244 radar that detected his driving speed. In other words, akin to appellant here, the defendant "sought live testimony about the test applied to the [subject] equipment to show that it performed correctly. [Citation.]" (662 F.Supp.2d at p. 484.)
However, the court ruled, "Collateral facts that do not speak to a defendant's guilt or innocence have been excepted from Sixth Amendment protection. [Citation.] Neutral statements that relate only to the operation of a machine constitute such collateral facts. [Citations.] [¶] Unlike the certificates at issue in Melendez-Diaz, in the instant case [the calibration test results] propound neutral information relating only to the proper operation of the radar equipment. Such calibration results do not pertain to any particular defendant or specific case. [Citation.]" (U.S. v. Bacas, supra, 662 F.Supp.2d at p. 485.) Therefore, they "lack the essential `primary purpose' of `establish[ing] or prov[ing] past events potentially relevant to later criminal prosecution' that would render them `testimonial.' [Citation.]" (Ibid.)
Like the testing results at issue in Bacas, the records Rowe produced reflect information relating to the proper functioning of a machine that is commonly used in law enforcement. The information is neutral in that it is not generated for use against a specific defendant or a particular breath test. Moreover, unlike the reports at issue in Melendez-Diaz, which "were completed almost a week after the tests were performed" (Melendez-Diaz, supra, 557 U.S. at p. ___ [129 S.Ct. at p. 2535]) the records Rowe generated were produced contemporaneously with his testing. Because they were not produced to establish a past fact relevant to appellant's prosecution, they do not fit within the United States Supreme Court's definition of testimonial hearsay. (See People v. Geier (2007) 41 Cal.4th 555, 607 [61 Cal.Rptr.3d 580, 161 P.3d 104] [the confrontation clause does not apply to lab reports that merely represent the "contemporaneous recordation of observable events"].)[1]
Another point of distinction between this case and Melendez-Diaz is that appellant had the opportunity to cross-examine the state's witnesses about the records and testing procedures that were utilized on the subject machine. Although appellant was not afforded the opportunity to cross-examine the *245 actual tester, Rowe, he was given considerable latitude in terms of cross-examining Nunley and Sterling about Rowe's records. In this regard, it is significant that Nunley and Sterling have considerable experience in the very testing Rowe conducted. They were able to explain how the Alco-Sensor works, how accuracy tests are performed and what Rowe's results signified. This afforded appellant a greater opportunity for cross-examination than if, as in Melendez-Diaz, the prosecution had relied solely on documentary evidence to establish the accuracy of the testing results at issue. (Accord, People v. Bowman (2010) 182 Cal.App.4th 1616, 1624, fn. 2 [107 Cal.Rptr.3d 156] ["recognizing a significant distinction between hearsay used by an expert to form an opinion, on the one hand, and the hearsay document itself"]; but see People v. Benitez (2010) 182 Cal.App.4th 194 [106 Cal.Rptr.3d 39], review granted May 12, 2010, S181137 [finding this distinction immaterial for purposes of the 6th Amend. confrontation clause].)
(4) For all these reasons, we hold the statements contained in Rowe's accuracy records were nontestimonial in nature. Therefore, the trial court did not err in allowing Nunley and Sterling to rely on them in forming their opinions. This procedure did not violate appellant's rights under the Sixth Amendment. (Accord, U.S. v. Griffin (E.D.Va., Sept. 22, 2009, No. 3:09MJ308) ___ F.Supp.2d ___ [accuracy testing results for Breathalyzer machine deemed nontestimonial]; State v. Bergin (2009) 231 Ore.App. 36 [217 P.3d 1087] [same].)

II
Turning to appellant's sentencing claims, the record shows the trial court sentenced him to 16 months in prison for driving under the influence, and a concurrent term of 16 months for driving with a blood-alcohol level of 0.08 percent or more. However, as the Attorney General concedes, the sentence on the latter count must be stayed under Penal Code section 654 because both offenses arose from a single episode of driving. (People v. Martinez (2007) 156 Cal.App.4th 851, 857 [67 Cal.Rptr.3d 670].)
(5) In addition, the abstract of judgment must be modified to conform to the court's oral sentencing decision. (People v. Mitchell (2001) 26 Cal.4th 181, 185-186 [109 Cal.Rptr.2d 303, 26 P.3d 1040] [where there is a discrepancy between the oral pronouncement of judgment and the minute order or abstract of judgment, the oral pronouncement controls].) Particularly, the abstract should reflect that, in pronouncing sentence, the court imposed a $50 "alcohol *246 abuse fee" pursuant to Vehicle Code section 23645 and a $30 "D.U.I. lab fee" under Penal Code section 1463.14. We will modify the judgment accordingly.[2]

DISPOSITION
The judgment is modified to stay appellant's sentence on count 2 for driving with a blood-alcohol level of 0.08 percent or more. (Pen. Code, § 654.) In addition, appellant is ordered to pay a $50 penalty under Vehicle Code section 23645 and a $30 penalty under Penal Code section 1463.14. The clerk of the superior court is directed to prepare an amended abstract of judgment reflecting these changes and forward a certified copy to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.
Sills, P. J., and Ikola, J., concurred.
NOTES
[1] Given that Geier preceded Melendez-Diaz by two years, courts have debated the extent to which it remains good law. The California Supreme Court is currently considering that issue and, in the process, has agreed to review some of the cases appellant has cited in his supplemental brief. (See People v. Lopez (2009) 177 Cal.App.4th 202 [98 Cal.Rptr.3d 825], review granted Dec. 2, 2009, S177046; People v. Dungo (2009) 176 Cal.App.4th 1388 [98 Cal.Rptr.3d 702], review granted Dec. 2, 2009, S176886; People v. Rutterschmidt (2009) 176 Cal.App.4th 1047 [98 Cal.Rptr.3d 390], review granted Dec. 2, 2009, S176213.) Because the Supreme Court has granted review of those decisions, we may not consider them. (Cal. Rules of Court, rules 8.1105(e), 8.1115(a).)
[2] Appellant complains that, in imposing these fees, the court did not determine whether he had the ability to pay them. However, appellant waived this claim by failing to raise it in the trial court. (People v. Forshay (1995) 39 Cal.App.4th 686, 689 [46 Cal.Rptr.2d 116]; People v. Gibson (1994) 27 Cal.App.4th 1466, 1468-1469 [33 Cal.Rptr.2d 217].)