[EDITORS' NOTE: TEXT NOT CERTIFIED FOR PUBLICATION APPEARS WITH GRAY BACKGROUND BELOW.]
*Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of parts I., II.B. and III.
OPINION
Hugo Gutierrez appeals from the judgment following his convictions for multiple counts of kidnapping and forcible sex crimes. He contends the court prejudicially erred in excluding evidence of his lack of criminal record which evidence would have challenged the victims' identification of him as the perpetrator. He also contends his Sixth Amendment right *Page 656 
to confrontation was violated by admission of testimony regarding the DNA and sexual assault reports from persons who had not initially analyzed the data and prepared the reports. Finally, he contends the movement of the victims was insufficient to support his convictions for aggravated kidnapping. We affirm.
 BACKGROUND
E.R. — Counts 1-6
At approximately noon on December 18, 2006, E.R. was jogging in Ernest Debs Park. She ran through the park to its outer perimeter and back to a circular area near the parking lot and picnic tables. On her second lap around this area, a man she had seen on her first lap sitting on a picnic table bench approached her. The man was Gutierrez. He pulled out a black metal revolver and demanded her iPod.
Gutierrez was wearing a dark "hoody" sweatshirt with the hood pulled over his head. He had big lips, a big nose, "big eyebrows," and a goatee.
E.R. grabbed the gun and pushed it away from her. She gave him her iPod and asked to leave. Gutierrez refused to release her and told her he wanted her "to pleasure him." He pushed her off the paved path over the embankment and then pushed or pulled her down the hillside covered with trees to a partially cemented drainage ditch largely secluded from public view. Heavy foliage and trees with drooping branches covered the hillside leading to the ditch.
When they reached the flat area of the drainage ditch Gutierrez unbuttoned his pants, took out his penis and told her to perform oral sex on him. She complied. After several minutes he stopped and she began crying. He warned her not to tell anyone or he would come after her. He appeared to take a photo of her using his camera phone. He then told her to take off her pants and shoes and, when she did not, he pulled her jogging pants down to her ankles. Gutierrez got on top of her and partially penetrated her vagina with his penis. He then turned her over and attempted to penetrate her both vaginally and anally. Gutierrez told her to perform oral sex on him again and she did so until he ejaculated in her mouth. She spit it out and Gutierrez told her to clean off his penis. He wanted her to use her mouth but she used her T-shirt instead. She noticed that Gutierrez had a scar on his right hip. *Page 657 
While E.R. was orally copulating Gutierrez she heard voices and saw people walking on a path further up the hill but her view of them was obscured by the foliage and tree branches. Gutierrez told her to stay quiet.
After Gutierrez ejaculated, he told her to remain there until he was gone. When she was sure he had left, she climbed up the slope, went home and took a shower. Later that evening a friend convinced her to report the incident to the police. Officers interviewed her and then took her to Los Angeles County+USC Medical Center for a sexual assault examination. There a nurse practitioner interviewed and examined her and prepared a report of her conclusions and findings. The nurse practitioner reported that E.R.'s genital examination was normal, that she had no injuries, and that the lack of injuries was consistent with the history E.R. provided of the assault. Based on E.R.'s description, the nurse practitioner noted in her report that the assault involved "attempted," rather than actual, vaginal and anal penetration.
By the time of trial the nurse practitioner had moved out of state. Julie Lister, the lead nurse practitioner at Los Angeles County+USC Medical Center, testified in her stead. Lister stated that after an independent review of the nurse practitioner's report, and based on the history that E.R. reported, she would have reached the same conclusions as the nurse practitioner who conducted the sexual assault examination.
After the examination, the officers drove E.R. to her home where they collected the clothes she had been wearing during the assault.
On January 11, 2006, officers showed E.R. a photo lineup. She selected Gutierrez's photo immediately. In the narrative portion of the photo array form she wrote, "I'm completely sure that the suspect number four [Gutierrez] is the one who committed the crime. I recognized him the instant I saw the picture. I remember him by his skin complexion, eyes, lips, and facial hair. There is no doubt that suspect number four [Gutierrez] is the person who committed this crime."
A criminalist tested E.R.'s T-shirt for the presence of biological material. Three large stains on the shirt tested positive for the presence of semen. The criminalist sent a cutting from the stain on the chest area of the T-shirt having the highest concentration of semen to Orchid Cellmark for DNA analysis, together with DNA reference samples from E.R. and Gutierrez, obtained after his arrest. *Page 658 
Jody Hynds is employed as a forensic supervisor at Orchid Cellmark, responsible for supervising six DNA analysts. She has a bachelor's degree in biology, a master's degree in forensic genetics and has been employed at Cellmark for over eight years. She had testified over 50 times regarding forensic testing of DNA, and had done so on behalf of both the prosecution and the defense, as such testing can be used to match individuals to evidence as well as to exclude individuals as possible suspects.
Hynds did not personally perform any tests, or prepare the initial analysis and report regarding the semen sample in this case. She instead reviewed the analyst's case file and independently analyzed the raw data. She made her own comparisons to the reference samples and checked them against those listed in the report to make sure she agreed with the analyst's conclusions. In conducting her analysis Hynds concluded that a comparison of all 13 locations on the DNA of the sperm sample on the T-shirt with the 13 locations on the DNA from Gutierrez's reference sample showed a match, indicating that the sperm came from Gutierrez. According to Hynds's calculations, the random probability of such a match was one in 237.5 quintillion in the Black population, one in 7.634 quintillion in the Caucasian population, one in 342.6 quadrillion in the Southwest Hispanic population, one in 1.319 quintillion in the Southeast Hispanic population and one in 229.4 quadrillion in the Asian population. Hynds explained that this DNA profile was exceedingly rare because a probability match of one in 6.6 trillion is generally considered sufficient to establish a person's identity.
M.M. and K.M. — Counts 7-9
On January 9, 2007, at approximately noon, M.M. and K.M. went hiking through the hillsides of Ernest Debs Park. As they returned to the flat area of the park near the parking lot, at a distance they saw Gutierrez sitting at a picnic table bench wearing a hooded sweatshirt with the hood pulled over his head.
As M.M. and K.M. turned around to walk back to their car they heard footsteps and someone yelling for them to stop. They turned around and saw Gutierrez running after them pointing a black metal revolver. The women clasped hands and started walking backward away from Gutierrez. Gutierrez gestured with the gun and told them "`come over here, come over and follow me.'" The women inched forward, slowly taking small steps. Gutierrez became frustrated, poked the gun into M.M.'s shoulder and said, "`Do you *Page 659 
want to die? Do you want to die?'" He told them "`come on, just follow me, hurry up, move over there, hurry up.'" Gutierrez gestured at an area past an embankment, down the hillside covered with trees and low hanging tree branches. The women looked over the embankment and saw what appeared to be a flat area with an unfinished drainage ditch where they would be out of public view because of all the foliage.
M.M. cried and pleaded with Gutierrez but he kept gesturing with the gun to prod them along. The women linked arms and slowly shuffled down the slope, sometimes deliberately tripping and falling in order to stall. When they reached the flat area near the drainage ditch the women pleaded with Gutierrez to let them go and offered Gutierrez their purses, a laptop and an iPod that were in the car. M.M. gave Gutierrez the $30 she had in her pocket and K.M. offered Gutierrez her wedding ring.
Gutierrez told K.M. to use her shoelaces to tie M.M.'s legs together. He said, "`You're going to please me,'" and gestured at his crotch, which gesture the women interpreted to mean that he wanted to have sex with them. Gutierrez pointed at M.M., and told her "`You're going to go first.'" M.M. cried, pleaded, and told Gutierrez she could not do it because she had two children. Gutierrez retorted that he did not care, that he had two strikes. M.M. told Gutierrez she was sick. He said he did not believe her. K.M. falsely told him that they were HIV positive, that they had AIDS, that they were each other's support system, and that they had come to the park to exercise to try to keep healthy.
When Gutierrez grabbed K.M. by the arm, M.M. fell to the ground and feigned a seizure. She curled into a fetal position and began rocking her body while breathing heavily. K.M. told Gutierrez that M.M. needed her pills that were in the car and that without them she would stop breathing and die. Gutierrez kept telling the women to be quiet so that the people walking on the pathway above would not hear them. K.M. kept telling M.M. "M[], M[], are you okay? Stay with me, keep breathing." On cue, M.M. started hyperventilating, panting and coughing, and creating even more noise. K.M. repeated that M.M. needed the pills that were in the car. Gutierrez allowed K.M. to leave to retrieve the pills while M.M. lay on the ground with her eyes closed pretending to be unconscious. She remained in this position until she heard some other man's voice calling and telling her to come back up the hill. She ran up the hill to the embankment where K.M. and a park ranger were waiting for her. *Page 660 
Police separately interviewed M.M. and K.M. at the park. K.M. described Gutierrez as Hispanic, wearing a Pro Club "hoodie" sweatshirt, with big lips, shaved head, cloudy bulging eyes as if he were on drugs, and facial hair she recalled as a moustache. M.M. described Gutierrez to the police as wearing a black "hoodie" sweatshirt, with Vans tennis shoes, Hispanic, five feet, six inches tall, with a shaved head and very large lips. While still at the park they each separately viewed binders of photographs of young Hispanic men and neither identified anyone in the photos as their assailant. They later met with a police sketch artist who made a composite drawing based on their descriptions of the assailant.
A few days later officers separately showed the two women a photographic lineup. M.M. immediately identified Gutierrez's photo. In the comments section of the photo identification form M.M. wrote, "The guy in card `B' [Gutierrez] is the young man who pulled a gun to me and my friend and forced us down the hill, threatened to kill us, and tried [to] make us do sexual favors. Same face and same color lip but he has goatee. 100% sure."
K.M. also immediately identified Gutierrez as their assailant. She selected the photo of Gutierrez and wrote in the comments section of the form, "I have identified the man in the card B, picture number 4, as the same man who held a gun to me and my friend and took us down a bank and implied to both of us that he wanted us to perform sexual favors on him. I'm a hundred percent sure that this is the man. He has the same eyes, round face, lips, except in this photo he has a goatee, a beard; and when I faced him, he had a mustache only."
Police arrested Gutierrez on January 11, 2007. When arrested he was wearing a dark blue Pro Club hooded sweatshirt. During booking Gutierrez reported that he was 18 years old, five feet six inches tall, and weighed 210 pounds. Police later searched the residence where he lived part time, located approximately 100 yards from Ernest Debs Park, and found no iPod, gun, or black hooded sweatshirt, and although they recovered his cell phone, it did not contain a picture of E.R. Gutierrez did not have a scar, only stretch marks across his pelvic area.
The investigating officer estimated that the culvert, or drainage ditch, where Gutierrez took all three women, was approximately 30 feet downslope from the edge of the embankment above, but he never measured the actual distance. He stated that all three identified the exact same spot in the park as the area where Gutierrez took them. The officer described the hillside as covered with so much dense brush and vegetation that it was difficult to see the walking path from the drainage ditch below. *Page 661 
Procedural Background
An information charged Gutierrez with forcible oral copulation (Pen. Code, § 288a, subd. (c)(2);[1] counts 1 3), forcible rape (§ 261, subd. (a)(2); count 2), attempted forcible sodomy (§§ 664, 286, subd. (c)(2); count 4), aggravated kidnapping (§ 209, subd. (b)(1); counts 5, 7 8), and robbery (§ 211; counts 6 9). As to the forcible oral copulation and rape counts, the information alleged the sentencing allegation that in the commission of the offenses Gutierrez personally used a firearm and kidnapped the victims and that the movement increased the risk of harm to the victims beyond the harm inherent in the underlying offenses. (§ 667.61, subds. (a)-(d).) The information further alleged with respect to the four sexual offenses that Gutierrez personally used a firearm in the commission of the crimes (§ 12022.3, subd. (a)), and that as to all counts he personally used a firearm within the meaning of section 12022.53, subdivision (b).
The jury found Gutierrez guilty of counts 1, 3, 5, 7 and 8 and of attempted forcible rape as a lesser included offense to count 2. The jury found Gutierrez not guilty of attempted sodomy as charged in count 4 and not guilty of the robbery as charged in count 9. The jury could not reach a verdict on the robbery charged in count 6 involving E.R.'s iPod and the court declared a mistrial on that count. The jury found true the kidnapping allegation but found not true all firearm use allegations. The court sentenced Gutierrez to an aggregate term of 34 years in prison plus two life terms. Gutierrez appeals from the judgment.
 DISCUSSION I. EVIDENCE OF GUTIERREZ'S CRIMINAL HISTORY* None of the victims testified at the preliminary hearing. Only police officers testified as permitted by article I, section 30, subdivision (b) of the California Constitution. (Prop. 115, approved June 5, 1990.) The prosecutor had not interviewed K.M. since the crimes occurred, defense counsel had never interviewed her and, for some undisclosed reason, neither the prosecution nor the defense expected K.M. to testify at trial.
 Nevertheless, K.M. appeared at trial. She testified that M.M. pleaded with Gutierrez to leave them alone, telling him that she had two children. Gutierrez retorted that he did not care, that he had two strikes. Gutierrez's counsel did not object. After her testimony, defense counsel requested the court to direct the investigating officer to provide a certified copy of Gutierrez's criminal history because he wanted the investigating officer to testify that based on his review of this history that Gutierrez did not have any strike convictions. Counsel argued that this evidence was relevant to the identity of the perpetrator because K.M.'s testimony raised the inference that the crimes involving M.M. and K.M. were committed by some other person who had two strikes. Counsel also argued that evidence of the statement about having two strikes was prejudicial because it left the jurors with the impression that Gutierrez was a violent and bad person. For this reason counsel wanted to rebut this negative inference with contrary evidence showing Gutierrez's lack of a criminal record.
 The court commented that whether or not testimony about the absence of information in a record was hearsay, and whether or not Gutierrez's statement as testified to by K.M. constituted character evidence he was entitled to rebut, the court concluded that the statement had not been offered for its truth but only for the effect it had on its listeners and to show the circumstances under which the crimes involving M.M. and K.M. occurred. Accordingly, the court denied Gutierrez's request on the ground it was irrelevant whether or not the "two strikes" statement was true. The court suggested that the parties either stipulate that Gutierrez had no strike convictions or, in the alternative, propose a limiting instruction to neutralize potential prejudice by directing the jury that they could not consider the statement for its truth.
 Defense counsel later informed the court that he intended to argue that Gutierrez did not have two strikes and therefore could not have committed the crimes against M.M. and K.M. The prosecutor objected on the ground that there was no admissible evidence to show that Gutierrez did not have any strike convictions, which evidence Gutierrez could have provided by testifying. The court ruled that defense counsel's argument would be improper, reiterating that the only relevance of the "two strikes" statement was its effect on the persons hearing the statement.
 Defense counsel proposed, in the alternative, a limiting instruction which the court provided as follows: "With regard to this case and part of the evidence in this case, you heard a statement testified to by K[.M.] with regard to the person who attacked her allegedly saying, `I have two strikes.' You may consider that evidence not for its truth but only as it affected the people who heard it. As to that limited purpose and any other evidence that was received for a limited purpose, . . . [¶] . . . You may consider that evidence only for that purpose and for no other."
 Gutierrez contends his convictions for kidnapping M.M. and K.M. in counts 7 and 8 must be reversed because the court's ruling deprived him of the right to impeach their identification of him as the perpetrator. (Citing Davis v. Alaska (1974) 415 U.S. 308, 317-318 [state's evidentiary rule which prevented the defendant from mentioning the key prosecution witness's juvenile probation status to permit the jury to determine his possible bias and credibility as a witness violated the defendant's Sixth Amendment right to confrontation]; Pennsylvania v. Ritchie (1987)480 U.S. 39, 56 [the Sixth Amendment guarantees a criminal defendant "the right to put before a jury evidence that might influence the determination of guilt"].) The Attorney General argues that the court's decision to exclude the evidence was a valid exercise of its discretion under Evidence Code section 352, and even if error, the error was harmless.
 We need not decide who is right. Even assuming error in failing to admit evidence that he did not have two strikes, we find such error was not prejudicial. Here the women's identification of Gutierrez as their kidnapper was exceptionally strong. Immediately after the incident both separately and accurately described Gutierrez's physical characteristics with one notable exception — he had a goatee as well as the moustache they described. While at the park, each separately viewed binders of photographs of young men (none containing a photo of Gutierrez) and did not select any photo as depicting the perpetrator. From their descriptions of their kidnapper a police sketch artist prepared a composite drawing which, we have viewed and determined, bears a strong resemblance to photographs of Gutierrez.
 When the women later viewed the photo array they both separately, unequivocally, and immediately identified Gutierrez's photo as a photo of their kidnapper, stating that they were 100 percent sure of their identification. On his arrest later that day, Gutierrez was wearing a dark "hoodie" sweatshirt with printing on the ties of the hood saying "Pro Club" just as K.M. had described to the police.
 Moreover, M.M. and K.M.'s independent identification of Gutierrez as their kidnapper was strengthened by the evidence that he used the same modus operandi as he had in his assault of E.R., where his identity as the perpetrator was established by witness identification evidence and by DNA evidence. In both incidents Gutierrez (1) attacked young women exercising; (2) assaulted women in the same park at approximately noon; (3) took the women to the identical location in the park — over an embankment through heavy foliage down to the partially cemented drainage ditch; and (4) used a black metal revolver to enforce compliance. From these marked similarities between the two incidents, E.R.'s equally positive identification of Gutierrez as her assailant, plus the unequivocal DNA evidence of the sperm on her shirt showing that the sperm came from Gutierrez, it is not reasonably probable that Gutierrez would have achieved a more favorable result had evidence been introduced that he did not have two strikes as M.M. and K.M.'s kidnapper had claimed. (People v. Watson (1956) 46 Cal.2d 818, 836.)
 II. ADMISSION OF FORENSIC EVIDENCE
A. Sexual Assault Examination
Gutierrez contends his Sixth Amendment right of confrontation was violated by admission of the lead nurse practitioner's, Julie Lister's, testimony regarding the sexual assault examination performed, and report prepared, by the nontestifying nurse practitioner. In his opening brief, Gutierrez *Page 662 
argues that People v. Geier (2007) 41 Cal.4th 555 [61 Cal.Rptr.3d 580,161 P.3d 104] (Geier) was wrongly decided but concedes that as an intermediate appellate court we are bound to follow the decisions of this state's highest court. (Auto Equity Sales, Inc. v. Superior Court (1962)57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937].) In his reply brief Gutierrez argues that the United States Supreme Court's recent decision in Melendez-Diaz v. Massachusetts (2009) 557 U.S. ___ [174 L.Ed.2d 314,129 S.Ct. 2527] (Melendez-Diaz) demonstrates the validity of his argument that Geier was wrongly decided.[2]
In Geier, the California Supreme Court held that the admission of certain reports concerning laboratory analysis of DNA evidence did not violate the confrontation clause even though the analyst who prepared the reports did not testify. (Geier, supra, 41 Cal.4th at pp. 596-609.) In that case, the analyst's supervisor testified at trial and described the tests, the manner in which the reports were prepared, the reliability of the tests, and the results reflected in the reports. (Id. at pp. 594-596.) The Supreme Court concluded that the reports were not testimonial and hence were not objectionable under the confrontation clause because the reports "constitute a contemporaneous recordation of observable events rather than the documentation of past events. That is, [the analyst] recorded her observations regarding the receipt of the DNA samples, her preparation of the samples for analysis, and the results of that analysis as she was actually performing those tasks." (41 Cal.4th at pp. 605-606.)
A principal basis for the Court's reasoning was the United States Supreme Court's decision in Davis v. Washington (2006) 547 U.S. 813 [165 L.Ed.2d 224, 126 S.Ct. 2266] (Davis). One of the pieces of evidence at issue in Davis was "a 911 tape in which the victim . . . described the attack on her by defendant to the 911 operator as it was occurring." (Geier, supra, 41 Cal.4th at p. 603.) Davis held that the victim's statements to the 911 operator "were not testimonial." (Ibid.) On that basis, the Court in Geier derived the principle that "contemporaneous recordation of observable events," as opposed to "documentation of past events," is not testimonial for purposes of the confrontation clause. (Geier, at p. 605.)
Two years after Geier, the United States Supreme Court decidedMelendez-Diaz, supra, 557 U.S. ___ [129 S.Ct. 2527]. In that case the trial court had admitted certain notarized affidavits stating that certain substances recovered from the defendant contained cocaine. (Id.
at p. ___ *Page 663 
[129 S.Ct. at p. 2531].) In a five-to-four decision, the Supreme Court held that "the analysts' affidavits were testimonial statements, and the analysts were `witnesses' for purposes of the Sixth Amendment. Absent a showing that the analysts were unavailable to testify at trial and that [the defendant] had a prior opportunity to cross-examine them, [the defendant] was entitled to `"be confronted with"` the analysts at trial." (Id. at p. ___ [129 S.Ct. at p. 2532], quoting Crawford v. Washington
(2004) 541 U.S. 36, 54 [158 L.Ed.2d 177, 124 S.Ct. 1354].) The Court rejected the dissent's argument that because the affidavits contained "`near-contemporaneous observations of the test,'" they were not testimonial. (Melendez-Diaz, supra, 557 U.S. at p. ___ [129 S.Ct. at p. 2535].) The Court noted that "[i]t is doubtful that the analyst's reports in this case could be characterized as reporting `near-contemporaneous observations'; the affidavits were completed almost a week after the tests were performed." (Ibid.) The Court also relied onDavis, but not on the same part of Davis that the California Supreme Court relied on in Geier. The Court in Davis had considered not only the 911 tape but also "the admissibility of statements made to police officers responding to a report of a domestic disturbance. By the time officers arrived the assault had ended, but the victim's statements — written and oral — were sufficiently close in time to the alleged assault that the trial court admitted her affidavit as a `present sense impression.'" (Melendez-Diaz, supra, 557 U.S. at p. ___ [129 S.Ct. at p. 2535].) The Court "nevertheless held that [the victim's statements] could not be admitted absent an opportunity to confront the witness." (Ibid.) Thus, the Court concluded in Melendez-Diaz that statements that are merely "near-contemporaneous" observations are testimonial and hence are subject to the requirements of the confrontation clause.
Four days after deciding Melendez-Diaz, the United States Supreme Court denied certiorari in Geier. (Geier, supra, 41 Cal.4th 555, cert. den. subnom. Geier v. California (2009) ___ U.S. ___ [129 S.Ct. 2856].)
The first question we must decide is whether Geier is still controlling law after Melendez-Diaz. We conclude that it is, because it is distinguishable from Melendez-Diaz on two grounds. First, in Geier the supervisor of the analyst who prepared the reports testified at trial. No such testimony was introduced in Melendez-Diaz. (See also Melendez-Diaz,supra, 557 U.S. at pp. ___-___ [129 S.Ct. at pp. 2544-2545] (dis. opn. of Kennedy, J.) [pointing out that the testing of a single sample for the presence of illegal drugs ordinarily requires the work of four people, and that it is not clear which of them is the "analyst" whom the defendant now has a right to confront at trial].) Second, Melendez-Diaz involved only "near-contemporaneous" affidavits that were prepared almost one week after the tests were performed, whereas Geier *Page 664 
involved contemporaneous reports prepared at the time the tests were conducted. Melendez-Diaz does not state that, contrary to Geier, contemporaneous recordation of observable events is testimonial; it says only that near-contemporaneous statements are testimonial. Geier held, in effect, that the lab reports at issue were more like Davis's 911 tape than like Davis's statements made to police who were responding to a report of a domestic disturbance. Melendez-Diaz casts no doubt on that holding.
The second question we must decide, given our answer to the first, is whether this case is controlled by Geier or Melendez-Diaz.[3]
Here, as in Geier, the supervisor testified at trial and was fully subject to cross-examination by the defense. Lister described the tests reflected in the report, described the procedures for eliciting and recording a sexual assault victim's description of the assault, and confirmed that the tests and protocols in performing these aspects of the sexual assault examination were standardized state-mandated protocols which had been fully complied with in this case. Here, as in Geier, Lister testified that the report was prepared at the time the tests and examination were conducted, not "almost a week after the tests were performed," as in Melendez-Diaz. (Melendez-Diaz, supra, 557 U.S. at p. ___
[129 S.Ct. at p. 2535].) Thus, with respect to the contemporaneous notations in the report regarding the tests performed and observations made *Page 665 
during the visual examination of E.R.'s body, the sexual assault examination report was not testimonial under Geier.
Those parts of the narrative portion of the report that constituted a recordation of past events "`made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial,'" (Crawford v. Washington, supra,541 U.S. at p. 52) are testimonial. The nurse practitioner who prepared the narrative portion of the report containing E.R.'s description of the assaults was not subject to cross-examination at trial. To the extent, however, admission of this narrative portion of the report ran afoul of Gutierrez's right of confrontation the violation did not result in prejudicial error. (Melendez-Diaz, supra, 557 U.S. at p. ___, fn. 14 [129 S.Ct. at p. 2542, fn. 14] [noting that, despite finding admission of the affidavits violated the defendant's confrontation clause rights, the resulting error was subject to harmless error review].) The statements in the report regarding the assault were largely duplicative of E.R.'s trial testimony and thus added nothing to the existing body of evidence. Moreover, the one difference between E.R.'s testimony and the statements in the report benefitted Gutierrez's case. From E.R.'s description of the assaults, the nurse practitioner noted in the report that the assault involved an attempted, rather than a completed, rape. Although E.R.'s testimony at trial was to the contrary, Gutierrez relied on these statements and notations in the sexual assault report to convince the jury to acquit him of the greater rape charge, which made him ineligible for aggravated sentencing under section 667.61.[4] Because nothing in the narrative portion of the report was potentially damaging to his case, error in its admission was not prejudicial.
B. DNA Evidence*
 Jody Hynds, a forensic supervisor at Orchid Cellmark, testified to the test results of the DNA samples in this case, rather than the analyst who performed the initial analysis and prepared the report. Gutierrez acknowledges that he did not object to Hynds's testimony regarding the DNA laboratory analysis and report prepared by the nontestifying analyst but again asserts that because the California Supreme Court's decision inGeier was controlling precedent at the time of trial, any objection would have been futile. As noted, Gutierrez argued in his opening brief thatGeier was wrongly decided but conceded that as an intermediate appellate court we were bound to follow the decisions of this state's highest court. (Auto Equity Sales, Inc. v. Superior Court, supra,57 Cal.2d at p. 455.) Gutierrez now claims that the United States Supreme Court's decision in Melendez-Diaz compels the conclusion that Geier was wrongly decided. For the reasons given ante, we disagree. Geier is still good law after Melendez-Diaz.
 Gutierrez makes no argument that admission of Hynds's testimony violated his confrontation rights under Geier, assuming Geier remained controlling precedent after Melendez-Diaz. Indeed, by arguing that an objection to Hynds's testimony would have been futile as long as Geier
was controlling, Gutierrez effectively concedes that the testimony was admissible under Geier. Thus, Gutierrez has not demonstrated that admission of Hynds's testimony regarding the DNA test results violated his confrontation rights.
 III. AGGRAVATED KIDNAPPING Gutierrez contends there was insufficient evidence of movement that was not incidental to the intended sexual assaults to support the aggravated kidnapping convictions and finding on the sentencing enhancement under section 667.61, subdivision (d)(2) relating to the forcible oral copulation conviction.
 "The test on appeal for determining if substantial evidence supports a conviction is whether `"a reasonable trier of fact could have found the prosecution sustained its burden of proving the defendant guilty beyond a reasonable doubt."` (People v. Johnson (1980) 26 Cal.3d 557, 576.) In making this determination, we `"must view the evidence in a light most favorable to respondent and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence."` (Ibid.)" (People v. Rayford (1994) 9 Cal.4th 1, 23.)
Elements of Aggravated Kidnapping
 Kidnapping to commit another crime, or aggravated kidnapping, requires movement of the victim that is not incidental to the commission of the underlying crime, and which increases the risk of harm over and above that necessarily present in the crime itself. (§ 209, subd. (b); Peoplev. Daniels (1969) 71 Cal.2d 1119, 1139; In re Earley (1975) 14 Cal.3d 122, 127-128.)[5]
 In considering whether the movement is merely incidental to the underlying crimes, "the jury considers the `scope and nature' of the movement. (People v. Daniels, supra, 71 Cal.2d at p. 1131, fn. 5.) This includes the actual distance a victim is moved. However, . . . there is no minimum number of feet a defendant must move a victim in order to satisfy the first prong. (People v. Daniels, supra, 71 Cal.2d at p. 1128
[to define the required movement `in terms of a specific number of inches or feet or miles would be open to a charge of arbitrariness'].)
 "In addition, [the Supreme Court has] since Daniels, supra, analyzed the question of whether the movement was incidental to the commission of the underlying crime by considering the context of the environment in which the movement occurred. (People v. Daniels, supra,71 Cal.2d at pp. 1131, fn. 5, 1140; In re Crumpton (1973) 9 Cal.3d 463,466.) Thus, in Daniels, the defendants, `in the course of robbing and raping three women in their own homes, forced them to move about their rooms for distances of 18 feet, 5 or 6 feet, and 30 feet respectively.' (People v. Daniels, supra, 71 Cal.2d at p. 1126.) [The Supreme Court] held that these brief movements were merely incidental to the commission of robbery. (Id. at p. 1140.) [The Court] observed, `Indeed, when in the course of a robbery a defendant does no more than move his victim around inside the premises in which he finds him — whether it be a residence, as here, or a place of business or other enclosure — his conduct generally will not be deemed to constitute the offense proscribed by section 209. . . .' [Citation.] [¶] . . . [¶]
 "The second prong of the Daniels test refers to whether the movement subjects the victim to [an] increase in risk of harm above and beyond that inherent in robbery. (In re Earley, supra, 14 Cal.3d at p. 131;People v. Lara (1974) 12 Cal.3d 903, 908, fn. 4.) This includes consideration of such factors as the decreased likelihood of detection, the danger inherent in a victim's foreseeable attempts to escape, and the attacker's enhanced opportunity to commit additional crimes. (See, e.g.,People v. Lara, supra, 12 Cal.3d at p. 908 fn. 4 [examples of such risk of harm `include not only desperate attempts by the victim to extricate himself but also unforeseen intervention by third parties']; Inre Earley, supra, 14 Cal.3d at p. 132 [`asportation gave rise to dangers, not inherent in robbery, that an auto accident might occur or that the victim might attempt to escape from the moving car or be pushed therefrom by [defendant]']. . . .) The fact that these dangers do not in fact materialize does not, of course, mean that the risk of harm was not increased. (In re Earley, supra, 14 Cal.3d at p. 132; People v. Lara,supra, 12 Cal.3d at p. 908.)" (People v. Rayford, supra,9 Cal.4th at pp. 12-14, citation omitted.)
Movement of the Victims
 The record does not disclose the precise distance between the area where Gutierrez first abducted the women and the drainage ditch where the assault and attempted assaults occurred. The witnesses provided various estimates of the distances between the paved path to the embankment, or from the embankment down the slope to the drainage ditch, ranging from 10 to 40 feet. Gutierrez contends, even accepting that the women were moved the greatest distance testified to, the distance was nevertheless insufficient to sustain the aggravated kidnapping convictions. We disagree.
 Gutierrez moved the women at gunpoint from the public area of the paved path near the parking lot and picnic tables to the embankment and down the hillside to the secluded area of the drainage ditch out of public view. In this concealed area Gutierrez could commit his crimes unobserved with passersby's views obscured by the heavy foliage and low hanging tree branches. The movement in this case changed the victims' environment from the open and public area of the park to a concealed area that decreased the likelihood his crimes would be detected, decreased the possibility of his victims' escape or rescue, increased his opportunity to commit additional crimes, and thus increased the victims' risk of harm. This combination of facts supports the jury's finding that the movement involved was substantial. It is immaterial whether the actual distance Gutierrez moved his victims was not particularly great as the distance moved is only one of the many factors to consider in the "totality of the circumstances." (People v. Dominguez (2006) 39 Cal.4th 1141, 1152 [no minimum distance is required to satisfy the asportation requirement for aggravated kidnapping so long as the movement is substantial].)
 Our conclusion that the movement in this case was sufficient to sustain the aggravated kidnapping convictions is supported by the Supreme Court's decision in People v. Dominguez, supra, 39 Cal.4th 1141. There the defendant moved his rape victim from the side of the road to a spot in an orchard 25 feet away and 10 to 12 feet below the level of the road. The Supreme Court acknowledged that this distance was not great, but concluded that other facts nevertheless provided substantial evidence of aggravated kidnapping. The Court observed, "the victim was moved to a location where it was unlikely any passing driver would see her. Not only was the place to which she was moved substantially below the road — one witness testified it was a down a `fairly steep' hill — it was within an orchard where the trees would also have tended to obscure defendant's crime from any onlookers. The movement thus changed the victim's environment from a relatively open area alongside the road to a place significantly more secluded, substantially decreasing the possibility of detection, escape or rescue." (Id. at p. 1153.)
 The facts of the present case are indistinguishable in principle from those in Dominguez and warrant the same conclusion that substantial evidence supports the jury's finding that the movement in this case was substantial. *Page 666 
 DISPOSITION
The judgment is affirmed.
Mallano, P. J., and Chaney, J., concurred.
[1] Further unmarked statutory references are to the Penal Code.
* See footnote, ante, page 654.
[2] The Attorney General argues that Gutierrez forfeited this issue by failing to object at trial. Because we conclude that some of the evidence was admissible under Geier and that the evidence that was inadmissible under Geier was not prejudicial, we need not reach the forfeiture argument.
[3] We note that the Court of Appeal has discussed Melendez-Diaz in three published opinions, People v. Rutterschmidt (2009)176 Cal.App.4th 1047 (Rutterschmidt), People v. Dungo (2009)176 Cal.App.4th 1388 (Dungo) and People v. Lopez (2009)177 Cal.App.4th 202 (Lopez). Rutterschmidt concluded, as we do, that Geier is still good law after Melendez-Diaz. (Rutterschmidt, supra,176 Cal.App.4th at pp. 1074-1075.) Dungo indicated that "`Melendez-Diaz undermines some of the rationale of'" Geier (Dungo,supra, 176 Cal.App.4th at p. 1401, fn. 11), but Dungo did not hold thatMelendez-Diaz overruled Geier. Rather, in Dungo the Attorney General withdrew his argument based on Geier, and the court consequently said nothing about whether the evidence at issue constituted a contemporaneous recordation of observable events. Nonetheless, we agree with Dungo's conclusion that Evidence Code section 801, subdivision (b), which allows experts to base their opinions on inadmissible evidence, is irrelevant to the confrontation clause issue, because "[w]here testimonial hearsay is involved, the confrontation clause trumps the rules of evidence." (Dungo, supra, 176 Cal.App.4th at p. 1403, fn. 14.) Lopez stated only that a certain blood-alcohol test report was admitted into evidence and that a supervisor testified at trial concerning the chain of custody of the blood sample. (Lopez, supra, 177 Cal.App.4th at p. 205.) Lopez did not discuss whether the report constituted a contemporaneous recordation of observable events as in Geier, and no witness testified concerning the procedures for testing the sample and preparing the report. Without noting those distinguishing features of Geier, Lopez concluded that the United States Supreme Court has "disapproved" Geier, because Melendez-Diaz "held that laboratory reports of the type presented in Geier" are testimonial. (Lopez, supra, 177 Cal.App.4th at p. 206.) We disagree, becauseMelendez-Diaz did not involve "laboratory reports of the type presented in Geier" — Melendez-Diaz involved "near-contemporaneous" affidavits that were completed nearly a week after the tests were performed, whereas Geier involved contemporaneous recordation of observable events.
[4] Section 667.61, subdivision (a) provides, "Any person who is convicted of an offense specified in subdivision (c) [including forcible rape, sodomy or oral copulation] under one or more of the circumstances specified in subdivision (d) or under two or more of the circumstances specified in subdivision (e) shall be punished by imprisonment in the state prison for 25 years to life."
* See footnote, ante, page 654.
[5] Section 209, subdivision (b) provides "(1) Any person who kidnaps or carries away any individual to commit robbery, rape, spousal rape, oral copulation, sodomy, . . . shall be punished by imprisonment in the state prison for life with the possibility of parole. [¶] (2) This subdivision shall only apply if the movement of the victim is beyond that merely incidental to the commission of, and increases the risk of harm to the victim over and above that necessarily present in, the intended underlying offense." *Page 667