187 Cal.App.4th 902 (2010)
114 Cal. Rptr. 3d 629
THE PEOPLE, Plaintiff and Appellant,
v.
EDWARD LORENZO MILLER, JR., Defendant and Respondent.
No. E049206.
Court of Appeals of California, Fourth District, Division Two.
August 20, 2010.
*904 Rod Pacheco, District Attorney, Alan D. Tate and Kelli Catlett, Deputy District Attorneys, for Plaintiff and Appellant.
Barbara A. Smith, under appointment by the Court of Appeal, for Defendant and Respondent.

OPINION
RAMIREZ, P. J.
A jury convicted Edward Lorenzo Miller, Jr., defendant, of sexual penetration of a minor (Pen. Code, § 288.7, subd. (b)).[1] Defendant's motion for a new trial was granted by the trial court. The People appeal, claiming the trial court abused its discretion in granting the new trial motion. (People v. Coffman and Marlow (2004) 34 Cal.4th 1, 127 [17 Cal.Rptr.3d 710, 96 P.3d 30].) We conclude that the trial court erred in two respects in granting the new trial motion and, therefore, reverse its order.

EVIDENCE ADDUCED AT TRIAL
Sometime well before September 18, 2008, the victim and her four sisters and her brother, along with their mother, moved into the home of the mother's aunt and the aunt's husband, who was defendant. The mother's aunt and defendant slept in one bedroom of the home and the mother slept in another. The children slept in the living room. The children got along well with defendant before September 18, 2008, and they had daily contact with him.
The victim, who was six years old at the time of the crime, testified that she and her brother were lying on the living room floor next to each other the night of September 18 when defendant entered the dark room, picked up the victim and carried her into his bedroom. Once they were in his room, defendant removed the victim's pajama bottoms and underpants and used his finger to touch her genitals. He moved his finger around on her genitals and put his fingers inside her vagina. He put his penis on her genitals. It hurt a little bit. He put her pants and pajama bottoms back on, but did so incorrectly, and returned her to the living room. The next morning, she told her *905 15-year-old sister about the incident when her sister noticed the victim trying to adjust her underwear (the victim had one leg through both leg openings of her underwear). Then, the victim told her mother, who took the underwear.
During a Riverside Child Assessment Team (RCAT) interview, a DVD of which was played for the jury, the victim said that defendant had taken her from the living room, where she was lying next to her brother, who saw what was happening,[2] carried her into his room and put her on his bed on her back. In defendant's room, he removed the victim's pants and underpants, licked his fingers and rubbed her vagina with them. Then he lay on her stomach and put his penis on her genitals. He moved his penis up and down and it hurt. A light or lights were on in defendant's room and the victim saw his face. Defendant stopped when the victim's mother came out of her bedroom to use the bathroom. Defendant put the victim's underpants and pajama bottoms back on her. He carried her back into the living room, while her brother watched. When she awoke the next morning, the victim noticed that her underwear and pajama pants were twisted because defendant had put them back on her too fast. She told her sister what had happened, then her mother.
The victim's 15-year-old sister testified that defendant's wife was not at the home, but was at work, the night of the crime. The sister noticed that the victim's pants were tangled when she saw her in the bathroom the morning after the crime. The victim told her sister that defendant had touched her. The sister saw a reddish brown stain on the victim's underwear. She called her mother into the bathroom, and the mother examined the victim's genitals and put the victim's underwear into a purse. That morning, the mother told the sister that she and her siblings should stay away from defendant.
The victim's brother was 10 or 11 years old at the time of the crime. He testified that the night of the crime, defendant entered the living room where he and the victim were lying next to each other and picked up the victim and carried her to his room. Although the living room was dark, he was 100 percent sure it was defendant.
*906 Defendant's wife testified that she had been away from the home for eight days and nights preceding the crime, working as an around-the-clock healthcare provider to the elderly.[3] She testified that the victim, her sister and her brother did not lie and she had not coached them in what to say about the crimes.
A male senior criminalist from the Department of Justice with 19 to 20 years of experience testified that a female senior criminalist at the lab in Richmond, California, that does DNA analysis, authored a report in which the latter concluded that sperm found on the victim's genitals matched defendant's and the likelihood that another person would have defendant's DNA profile is one in 35 quadrillion for African-Americans, one in 5.5 quadrillion for Caucasians and one in 200 quadrillion for Hispanics, which greatly exceeds the number of people who inhabit the earth.[4] He said the report also concluded that sperm found on the victim's underpants could not be excluded as having DNA matching defendant's, which was not as strong an indicator as the sperm found on her genitals. He said the report had been made in the normal course of business and at or near a time when the testing was completed. The male criminalist testified about the guidelines and checklists required for performing the procedures and authoring the report the female criminalist had written. Additionally, he said, the report author's notes and the report are reviewed by a second DNA analyst, who has checklists to follow and who "recrunch[es] all the data on the computer and make[s] sure the results that [he/she] sees [are] the same as what the [author of the report] sees" and checks off the checklist which the author used. Then, a third review is done, which is administrative. During it, the work of the second DNA analyst is reviewed, as are the notes of the report author and the report, itself, and, once again, the checklist the author used is reviewed. Both of these reviews were done in this case and the people that did them signed the report. The male criminalist, who, in the regular course of business, had both authored and reviewed reports such as the one authored by the female criminalist, testified that he had spoken with the female criminalist on the phone and he had made sure that everything was okay and that "multiple procedures [were done] in order to guarantee the reliability of th[e] report." He did not examine any of the specimens in the case or stand over the female criminalist as she did her work, but he testified that he would be surprised if she had not followed the required checklists, and that would be unlikely, due to the two reviews described above.
*907 Additionally, the male criminalist testified that he can independently look at the DNA-typing information that is in reports and make a conclusion as to whether or not the DNA matches. He said he did this in this case and came independently to the same conclusions the female criminalist had madein fact, he concluded that the likelihood of someone else having defendant's DNA was one in a number greater than the number of people who had ever lived. He did not review the author's notes, or the electronic data from the genetic analyzer, but he relied on the accuracy of the report and reviewed it.
The male criminalist testified that he was unable to say when the sperm was deposited on the victim's genitals and her panties. He said that, if not disturbed, a sperm cell can last for years on a pair of panties.
Defendant testified as the only substantive witness for the defense. He denied that he had molested the victim. He claimed that for one month preceding the crime, the victim's mother was prostituting herself and using drugs in his home and because he was on parole, he needed to distance himself from her illegal activities. Consequently, he spent the nights of Tuesday, September 16, and Wednesday, September 17, at the home of what he described as "a ho and a crackhead," not returning home until 5:00 or 6:00 a.m. He did not explain how spending time with this woman was different, in terms of the continuation of his parole, from being in a house with the victim's mother, who, according to him, was doing the same things his friend was doing. He also testified that despite his disapproval of what the victim's mother was doing, he had sex with her on Monday, September 15, and, thereafter, told her that if she did not stop her illegal actions or take them elsewhere, he would kick her out of the house as she was jeopardizing his parole. He also did not explain how his admitted use of marijuana during this time did not jeopardize his parole, while the victim's mother's alleged activities did. He said the victim's mother responded to his threat by telling him that she was going to get him out of the house, which belonged to her aunt, and not to him. Defendant asserted that the victim's mother conspired with his wife and her children to frame him for the molestation in order to get him out of the house. He further testified that the victim's mother planted his sperm on her daughter's genitals, which she obtained from a condom he had used when he had sex with the mother. He claimed that the victim and her siblings were petrified of their mother, and they lied at trial under her direction, despite the fact that she had been in prison for six months at the time of trial.
Ironically, defendant admitted that he had been accused of touching the vagina of an eight-year-old girl in 2007. However, defendant claimed that he had also been framed in this incident and the victim's mother had once again been involved in it because he had threatened to turn her in. Defendant *908 asserted that the victim's mother and others had been involved in a childcare fraud ring and they had recruited him to join the ring. Defendant testified that he refused to join the ring because he was on parole at this time and the mother and others retaliated against him. Initially, he claimed that they retaliated against him by claiming he had stolen money from a female member of the ring, then by framing him for molesting the stepdaughter of another member. Curiously, defendant testified that this victim had, indeed, been molested, but not by him. He did not explain how he could have known that she had been molested. Nor did he explain why the ring could not just have accused him of stealing the money as a way of getting his parole revoked, rather than resorting to the story of the molestation. He testified that the victim's mother was aware that defendant's parole had been revoked in 2007 due to that molestation accusation, so she knew that framing him again for the same thing was a sure way to get rid of him.

ISSUE AND DISCUSSION
After the jury convicted defendant of sexual penetration of the victim, his attorney brought a motion for a new trial, claiming that under Melendez-Diaz v. Massachusetts (2009) 557 U.S. ___ [174 L.Ed.2d 314, 129 S.Ct. 2527] (Melendez-Diaz), which was decided after this trial, the female criminalist's report was testimonial hearsay, and since she did not testify at either the preliminary hearing or trial, admission of her report violated his right to confrontation.
The trial court ruled, "[T]he issue here is . . . whether the admission of the [female criminalist's report] violated the defendant's . . . Sixth Amendment rights and/or was erroneous on some other basis. [¶] My analysis is as follows: The first issue is to determine whether or not the statements were testimonial, and the test for that is whether or not there were circumstances such that an objective witness would reasonably believe that the statement would be available for use at a later trial. [¶] I think the answer with respect to the [female criminalist's] report clearly is yes. [¶] . . . [¶] . . . [T]he [c]ourt does feel that the [c]ourt erred in admitting [the female criminalist's report]. The [c]ourt erred because, first of all, after looking at the case law, it's clear that report does not qualify as a business record, as I thought it did. That was erroneous. There's cases right on point that talk about drug test results and scientific evidence as not qualifying as business records. [¶] . . . [¶] . . . [The report] is not a business record, and it would violate Crawford because [the female criminalist] wasn't here. . . . [¶] . . . I shouldn't have . . . allow[ed the male criminalist] to testify to [the report] as part of his opinion . . . also because it doesn't qualify as a business record. . . . [¶] . . . [¶] . . . As to any Crawford issue, it's really a case of first impression, but the business records *909 was just plain error on my part . . . ."[5] The court further concluded that admission of the report so prejudiced defendant that he was entitled to a new trial.
The trial court was incorrect in three respects: first, that exclusion of the report was required under Melendez-Diaz, second, that the report was not admissible under the exception to the hearsay rule which the trial court used to admit it and, third, that the presence of the report in this case so prejudiced defendant that he was entitled to a new trial due to its erroneous admission.
Turning to our first conclusion that Melendez-Diaz did not require exclusion of the female criminalist's report, the issue in Melendez-Diaz was the propriety of the admission of "affidavits reporting the results of forensic analysis which showed that material seized by the police and connected to the defendant was cocaine." (Melendez-Diaz, supra, 557 U.S. at p. ___ [129 S.Ct. at p. 2530].) The affidavits only "reported the weight of the seized bags and stated that the bags `[h]a[ve] been examined with the following results: The substance was found to contain: Cocaine.'" (Id. at p. ___ [129 S.Ct. at p. 2531.) The United States Supreme Court concluded that the affidavits were testimonial, rendering the affiants "witnesses," subject to the defendant's right of confrontation under the Sixth Amendment. (557 U.S. at p. ___ [129 S.Ct. at p. 2531].) Finding the affidavits to be "functionally identical to live, in-court testimony, doing `precisely what a witness does on direct examination . . .' [citation]" (id. at p. ___ [129 S.Ct. at p. 2532]), the court concluded that there *910 was little doubt they were testimonial statements (ibid.). The defendant was entitled to confront the analysts at trial and the fact that they were unavailable to him rendered the affidavits inadmissible. (Ibid.)
(1) In countering arguments by the four dissenting justices and the respondent in Melendez-Diaz, its author, Justice Scalia, said something that is at odds with the California Supreme Court's rationale in People v. Geier (2007) 41 Cal.4th 555 [61 Cal.Rptr.3d 580, 161 P.3d 104] (Geier), from which we quote the following, "[T]he prosecution's DNA expert . . . testified that in her opinion DNA extracted from [the victim] matched a sample of defendant's DNA. . . . [Defendant] asserts that her testimony violated his Sixth Amendment confrontation right as construed by the Supreme Court in Crawford v. Washington (2004) 541 U.S. 36 [158 L.Ed.2d 177, 124 S.Ct. 1354], because her opinion . . . was based on testing that she did not personally conduct. . . . [¶] . . . [¶] . . . [She] oversees testing and supervises the six analysts who conduct the testing. . . . [¶] . . . Th[e] record is sufficiently complete that [the expert] or another analyst could reconstruct what the analyst who processed the samples did at every step. [¶] . . . [¶] . . . She testified further that, based on her review of [the analyst's] notes, in her opinion the DNA extraction was conducted according to protocol. . . . [¶] . . . [¶] Under Crawford, the crucial determination about whether the admission of an out-of-court statement violates the confrontation clause is whether the out-of-court statement is testimonial or nontestimonial. . . . [¶] . . . Crawford made it clear that `not all hearsay implicates the Sixth Amendment's core concerns . . .' [citation] . . . . [`]Most of the hearsay exceptions covered statements that by their nature were not testimonialfor example, business records . . . .' [Citation.] [¶] . . . Crawford declined to definitively state what constitutes a `testimonial' statement . . . but observed: `Various formulations of this core class of "testimonial" statements exist: "ex parte in-court testimony or its functional equivalentthat is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially," [citation]; "extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions," [citation]; "statements that were made under circumstances [that] would lead an objective witness reasonably to believe that the statement would be available for use at a later trial" [citation].' [Citation.] . . . [¶] Defendant argues that the DNA report that was the basis of [the expert's] testimony was a testimonial statement because it was a statement `"made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial."' [Citation.] [¶] . . . [¶] . . . [S]uch evidence is not testimonial, based on our own interpretation of Crawford and Davis [v. Washington (2006) 547 U.S. 813 [165 L.Ed.2d 224, 126 S.Ct. 2266]]. . . . [A] statement is *911 testimonial if (1) it is made to a law enforcement officer or by or to a law enforcement agent and (2) describes a past fact related to criminal activity for (3) possible use at a later trial. Conversely, a statement that does not meet all three criteria is not testimonial. [¶] . . . [¶] It is the second point, the distinction drawn in Davis between the circumstances under which . . . [the] statement was madea contemporaneous description of an unfolding event . . . that is critical here. [Citation.] There is no question that the DNA report was requested by a police agency. . . . [The analyst was] paid to do work as part of a government investigation; furthermore, it could reasonably have been anticipated that the report might be used at a later criminal trial. [The analyst's] observations, however, constitute a contemporaneous recordation of observable events rather than the documentation of past events. . . . [¶] . . . [¶] . . . As we read Davis, the crucial point is whether the statement represents the contemporaneous recordation of observable events. . . . [¶] . . . [¶] . . . We conclude therefore that the DNA report was not testimonial for purposes of Crawford and Davis." (Id. at pp. 593-607, italics omitted & added.)
What Justice Scalia said in Melendez-Diaz about the importance of the fact that the report is a contemporaneous recordation of observable events was the following, "The dissent . . . contends that . . . `. . . [the] analyst's report contains near-contemporaneous observations of the test.' [Citation.] . . . [T]he dissent misunderstands the role that `near-contemporaneity' has played in our case law. The dissent notes that that factor was given `substantial weight' in Davis . . . . but in fact that decision disproves the dissent's position. There the Court considered the admissibility of statements [the victim] made to police officers [concerning a crime]. By the time officers arrived the [crime] had ended, but the victim's statementswritten and oralwere sufficiently close in time to the [crime] that the trial court admitted [the victim's] affidavit as a `present sense impression.' [Citation.] Though the witness's statements in Davis were `near-contemporaneous' to the events she reported, we nevertheless held that they could not be admitted absent an opportunity to confront the witness. [Citation.]" (Melendez-Diaz, supra, 557 U.S. at p. ___ [129 S.Ct. at p. 2535].)
The question then is whether this language in Melendez-Diaz effectively "overruled" the holding in Geier that the contemporaneity of the recordation of observable facts is crucial in determining whether the female criminalist's report here was testimonial and, therefore, as defendant contends, required that she testify.[6]
*912 (2) First, the above cited language from Melendez-Diaz was not part of the holding of the case, but was merely part of a rebuttal to issues raised by the dissent and the respondent. Melendez-Diaz did not hold that defendant's right to confrontation was violated here by the admission of the female criminalist's report. Melendez-Diaz was a five-to-four opinion, with Justice Thomas as one of the five. In a concurrence, he wrote, "I write separately to note that I continue to adhere to my position that `the Confrontation Clause is implicated by extrajudicial statements only insofar as they are contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions.' [Citations.] I join the Court's opinion in this case because the documents at issue in this case `are quite plainly affidavits . . .' [citation]. As such, they `fall within the core class of testimonial statements' governed by the Confrontation Clause. [Citation.]" (Melendez-Diaz, supra, 557 U.S. at p. ___ [129 S.Ct. at p. 2543] (conc. opn. of Thomas, J.).) Therefore, the fifth justice in the Melendez-Diaz majority did not endorse the comments made by the author that contradict the holding in Geier. "When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, `the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds. . . .' [Citation.]" (Marks v. United States (1977) 430 U.S. 188, 193 [51 L.Ed.2d 260, 97 S.Ct. 990]; see also Panetti v. Quarterman (2007) 551 U.S. 930, 949 [168 L.Ed.2d 662, 127 S.Ct. 2842]; Del Monte v. Wilson (1992) 1 Cal.4th 1009, 1023 [4 Cal.Rptr.2d 826, 824 P.2d 632].) By supplying the fifth vote on grounds narrower than those seemingly adopted by the majority, Justice Thomas's position takes on a heightened significance in interpreting Melendez-Diaz. (See Romano v. Oklahoma (1994) 512 U.S. 1, 9 [129 L.Ed.2d 1, 114 S.Ct. 2004]; U.S. v. Brown (5th Cir. 2008) 553 F.3d 768, 783; People v. Rios (2009) 179 Cal.App.4th 491, 501, 502, 503 [101 Cal.Rptr.3d 713]; Tily B., Inc. v. City of Newport Beach (1999) 69 Cal.App.4th 1, 16 [81 Cal.Rptr.2d 6]; Blanco v. Baxter Healthcare Corp. (2008) 158 Cal.App.4th 1039, 1050, fn. 7 [70 Cal.Rptr.3d 566].)
It is also noteworthy that the United States Supreme Court denied certiorari in Geier days after it issued its opinion in Melendez-Diaz (Geier v. California (2009) 557 U.S. ___ [174 L.Ed.2d 600, 129 S.Ct. 2856]) thus implying that the former was not inconsistent with the latter.
Finally, there are significant differences, in terms of defendant's Sixth Amendment rights, between Melendez-Diaz and this case. In Melendez-Diaz, there was no witness for the defense to cross-examine, to possibly uncover *913 inept work or false conclusions, a point deemed important by Justice Scalia when discussing the objections to the majority's holding advanced by the dissent and the respondent. (Melendez-Diaz, supra, 557 U.S. at pp. ___, ___ [129 S.Ct. at pp. 2536, 2537].) In Melendez-Diaz, the defendant "did not know what tests the analysts performed, whether those tests were routine, and whether interpreting their results required the exercise of judgment or the use of skills that the analysts may not have possessed." (Id. at p. ___ [129 S.Ct. at p. 2537].) Here, the jury was told what tests were performed, how they were performed and how the female criminalist came to the conclusion she did.
(3) Thus, we are bound by Geier, a decision not even mentioned by the trial court, which holds that if the female criminalist's report is a contemporaneous recordation of observable events, which the male criminalist testified it was, it is not testimonial and its admission does not violate defendant's right to confrontation. Therefore, the trial court erred in its conclusion that it did.
Second, the trial court erroneously concluded that the report was not admissible under the hearsay exception it used to admit it. Before the male criminalist testified, defense counsel informed the court that the prosecutor was going to seek to have the report admitted as a business record. Counsel objected on the basis that the author of the report, the female criminalist, would not be called to testify. The prosecutor told the court that he could meet all the elements for the business records exception. The trial court told the prosecutor he would have to lay an adequate foundation for the report to be admitted as a business record. However, during the male criminalist's testimony, the trial court told defense counsel, "[The prosecutor has] made a sufficient showing not as a business record under [1271] but under 1280 as an official act. He's made the requisite showing. . . . [T]here's been a sufficient showing under 1280 to satisfy the [c]ourt. The person who did this test [(the female criminalist)] is a person charged with doing those tests. They're done as a public servant. They're done in the regular course of business, and I have heard sufficient evidence to convince me as a foundational matter that they're trustworthy. . . . [W]e're past . . . your initial objection under 1280, not 1271."
Evidence Code section 1280 provides, "Evidence of a writing made as a record of an act, condition, or event is not made inadmissible by the hearsay rule when offered in any civil or criminal proceeding to prove the act, condition, or event if all of the following applies: [¶] (a) The writing was made by and within the scope of duty of a public employee. [¶] (b) The writing was made at or near the time of the act, condition, or event. [¶] (c) The sources of information and method and time of preparation were such as to indicate its trustworthiness. . . . ."
*914 In granting the new trial motion, the trial court did not state in what way its ruling that the report was admissible as a record by a public employee was incorrect. In fact, the court said only that the report was not admissible as a business recordit said nothing of its admissibility under the public records exception to the hearsay rule. Neither in his written motion for a new trial nor at the hearing on the motion did defense counsel below even address the public records exception, therefore, we cannot derive from his arguments a possible basis for the trial court's conclusion that it had erred in admitting the report under that exception to the hearsay rule. We conclude that the trial court did not abuse its discretion in admitting the record under the public employee records exceptions. The male criminalist's testimony, as set forth above, provided an adequate foundation for the admission of the report under this exception.[7]
Finally, even if the report should have been excluded, we cannot agree with the trial court that its erroneous admission so prejudiced defendant that he is entitled to a new trial. It is rare to see a molestation case of a young child in which the evidence of guilt is stronger than that here. All three childrenthe victim, her 15-year-old-sister and her 11-year-old brother testified consistently as to what occurred that night and that it was defendant, and no one else, who took the victim into his bedroom. The victim's RCAT interview was entirely consistent with her trial testimony and neither she nor her siblings were impeached with contradictory pretrial statements about the important events surrounding the crimes. The male criminalist's independent conclusion, which the trial court ruled in its motion for a new trial had been properly admitted, effectively put the nail in the coffin of defendant's guilt. And, as we have already observed, defendant's testimony, unlike that of the prosecution witnesses, defied belief. Ironically, he did not contend that the DNA found on the victim's genitals was not his, a defense that would have rendered the admission of the report prejudicial to himrather, he claimed that the DNA was, indeed, his, but had been placed there by the victim's mother in yet another attempt to frame him for child molestation. We cannot fathom circumstances more clearly calling for the denial of defendant's motion for a new trial than these.

*915 DISPOSITION
The motion granting a new trial is reversed.
Hollenhorst, J., and Richli, J., concurred.
NOTES
[1] All further statutory references are to the Penal Code unless otherwise indicated.
[2] Defendant misconstrues statements made by the victim during this interview. In an effort to discredit her account of the crime, defendant implies that the victim's brother was screaming and yelling at defendant either when defendant picked the victim up and carried her out of the living room or during the molestation. However, the victim stated that in her sleep, she accidentally rolled over onto her brother, waking him up and he screamed to defendant that she had done so. Clearly this occurred before defendant took the victim from the living room because the victim stated that she was awake when defendant picked her up. She shook her head "no" when the RCAT interviewer asked her if defendant knew that her brother was awake when he picked her up. She said her rolling onto her brother is what woke her brother up and her brother yelled out to defendant while defendant was in his bed and then defendant came out to the living room and moved the victim away from her brother, before picking her up and taking her into his room.
[3] Defendant confirmed this.
[4] He said that number was six billion.
[5] The court concluded that the testimony of the male criminalist, independent of the report, did not violate defendant's right to confrontation because he was available to be cross-examined. At the same time, however, the court stated, ". . . I do not think I need to reach that issue really because I think the error in admitting [the female criminalist's report] was so prejudicial to the defendant that I should grant the motion for a new trial. [¶] . . . [¶] . . . I want to make clear that I don't feel it's really necessary to reach the Crawford issue with respect to the [male criminalist's] testimony. I'm basing [my granting of the new trial motion] upon the erroneous admission of [the female criminalist's report] because I can't admit it separately. It's not a business record, and it would violate Crawford because the [female criminalist] wasn't here. . . . I'm not reaching the question and deciding the question of whether or not an expert testifying on the basis of some other information violates Crawford. I don't have to reach that issue, although[,] frankly[,] my feeling is no. [¶] But the real bottom point here is that I allowed [the female criminalist's report] into evidence. . . . [I]f I was allowing the [male criminalist] to testify to it as part of his opinion, and I shouldn't have done that also because it does not qualify as a business record. . . . [¶] And I think it was so prejudicial that the defendant should receive a new trial because the DNA evidence isotherwise, it's just a credibility issue between a five year old and an adult defendant. And so that's why I'm doing this."

Because the court's conclusions about the admissibility of the male criminalist's testimony, apart from the female criminalist's report, were unnecessary to and did not form the basis for its decision to grant a new trial, we decline the parties' invitation to review them. We also decline defendant's invitation to address asserted issues with the chain of custody of the victim's pants and underwear because they were irrelevant to the trial court's granting of the motion for a new trial.
[6] The issue of how Melendez-Diaz affects Geier is presently pending before the California Supreme Court in four cases: People v. Rutterschmidt (2009) 176 Cal.App.4th 1047 [98 Cal.Rptr.3d 390], review granted December 2, 2009, S176213; People v. Gutierrez (2009) 177 Cal.App.4th 654 [99 Cal.Rptr.3d 369], review granted December 2, 2009, S176620; People v. Dungo (2009) 176 Cal.App.4th 1388 [98 Cal.Rptr.3d 702], review granted December 2, 2009, S176886; and People v. Lopez (2009) 177 Cal.App.4th 202 [98 Cal.Rptr.3d 825], review granted December 2, 2009, S177046. Rutterschmidt does not involve the admission of the actual report. The other cases do.
[7] Appellate counsel for defendant goes way beyond the parameters of the motion for a new trial by arguing extensively that the male criminalist should not have been allowed to testify to the conclusions of the female criminalist because he could not be certain that she followed all the procedures and precautions she was required to. Counsel makes this assertion in the context of counsel's argument that admission of the report cannot be deemed to be harmless because this was yet another basis upon which the trial court could have excluded the report. However, we are examining not what the trial court could have done but what it actually did. The trial court did not address this issue in ruling on the new trial motion and we will, therefore, not address it either.